1328

OKLAHOMA FIREFIGHTERS PEN-
SION & RETIREMENT SYSTEM and
Oklahoma Law Enforcement Retire-
ment System, individually and on be-
half of all others similarly situated,
Plaintiffs,

v.

IXIA, a corporation, Victor Alston, an
individual, Atul Bhatnagar, an indi-
vidual, Thomas B. Miller, an individu-
al, and Errol Ginsburg, an individual,
Defendants.

Case No. CV 13–08440.MMM (SHx).

United States District Court,
C.D. California.

Signed Oct. 6, 2014.

Jeff S. Westerman, Anna Faircloth, Westerman Law Corp, Los Angeles, CA, Caitlin M. Moyna, James J. Sabella, Grant and Eisenhofer PA, New York, NY, Diane Zilka, John C. Kairis, Grant and Eisenhofer PA, Wilmington, DE, for Plaintiffs.

Bradley James Dugan, Bryan Cave LLP, Santa Monica, CA, Eric Rieder, Ronald J. Bliss, Bryan Cave LLP, New York, NY, Christopher G. Caldwell, Benjamin B. Au, Julia Jill Bredrup, Caldwell Leslie and Proctor PC, Sheldon E. Eisenberg, Adam J. Thurston, Alexandra N. Burgess, Erin

E. McCracken, Drinker Biddle and Reath LLP, Los Angeles, CA, for Defendants.

*CLASS ACTION*

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

MARGARET M. MORROW, District Judge.

This is a putative securities class action against defendant Ixia and defendants Victor Alston, Atul Bhatnagar, Thomas B. Miller, and Errol Ginsburg (the "individual defendants"). Plaintiffs allege that during the class period, defendants misled the public by improperly classifying Ixia's revenue. They assert that defendants sought to portray Ixia, which was exceeding its revenue and earnings per share targets during the class period, as a steady growth company. They contend that to foster this image, Ixia did not record certain present revenue and instead booked it as deferred revenue to give the impression that the company would continue to grow at an attractive rate in future quarters. Plaintiffs contend this misled inventors and caused them to conclude that Ixia's growth would continue for some period of time.

They assert that by making these misleading statements, defendants violated section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b–5 during a class period that extended from November 28, 2007 to August 17, 2010. They also assert that defendants Victor Alston, Atul Bhatnagar, Thomas B. Miller, and Errol Ginsburg violated § 20(a) of the 1934 Act because they were controlling persons of Ixia.[1]

On June 11, 2014, plaintiffs filed a first amended complaint.[2] Defendants filed various motions to dismiss on July 18, 2014.[3] Plaintiffs filed omnibus opposition on August 18, 2014.[4]

## I. BACKGROUND AND FACTUAL ALLEGATION

### A. Background Concerning Ixia, the Individual Defendants and the Plaintiff Class

Ixia was incorporated in California in 1997 and maintains its headquarters in Calabasas.[5] Ixia's core operations focus on delivery of information technology solutions to a wide array of organizations through real-time monitoring and rapid assessment of network systems. Its products are used to provide "end-to-end visibility"—a more complete understanding of user behavior, security vulnerabilities, network capacity, application performance, and information technology resiliency.[6]

Ginsburg founded Ixia in 1997; he has been chairman of its board of directors since January 2008 and chief innovation officer since March 2008.[7] Alston joined

---

1. First Amended Class Action Complaint ("FAC"), Docket No. 61 (Jun. 11, 2014), ¶¶ 195–210.

2. *Id.* at 1.

3. Defendant Atul Bhatnagar, Errol Ginsburg, and Thomas B. Miller's Motion to Dismiss First Amended Complaint ("BGM MTD"), Docket No. 81 (July 18, 2014); Defendant Ixia's Motion to Dismiss First Amended Complaint ("Combined MTD"), Docket No. 83 (July 18, 2014); Defendant Victor Alston's

Motion to Dismiss First Amended Complaint ("Alston MTD"), Docket No. 85 (July 18, 2014).

4. Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss ("Opposition"), Docket No. 89 (Aug. 18, 2014).

5. FAC, ¶ 20.

6. *Id.*

7. *Id.*, ¶ 24.

Ixia in 2004 as vice president of application development. In 2006, he was promoted to vice president of engineering, and in June 2007 to senior vice president of product development. Alston became president and chief executive officer of the company in May 2012, and served in that capacity until his resignation on October 24, 2013.[8] Bhatnagar was hired as Ixia's chief operating officer on September 4, 2007; he served as president and chief executive officer from March 2008 until Alston assumed the position in May 2012.[9] Miller served as Ixia's chief financial officer from March 2000 to March 3, 2014.[10]

Plaintiffs allege that each of the individual defendants had authority to control the contents of Ixia's quarterly reports, annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.[11] Each of the individual defendants allegedly "received copies" of Ixia's press releases and reports "prior to or shortly after their issuance," and each purportedly "had the ability and opportunity to prevent their issuance or cause them to be corrected."[12] Plaintiffs contend that, as a result of their positions at Ixia, and their access to material nonpublic information, the individual defendants knew that the adverse information detailed in the complaint had not been publicly disclosed and was being concealed. As a result, each allegedly knew that the representations being made by the company were false and misleading.

Plaintiffs are public pension retirement funds that allegedly acquired shares of Ixia at artificially inflated prices during the class period and that have been damaged as a result.[13] They bring this class action on behalf of all persons who purchased or otherwise acquired Ixia's publicly traded common stock from February 4, 2011 to and including April 3, 2013.[14]

## B. Defendants' Allegedly Fraudulent Scheme

Plaintiffs allege that Ixia's common stock began to trade publicly on the NASDAQ on October 25, 2000.[15] Analysts viewed Ixia as a growth company in 2004 and 2005, and the price of its stock rose steadily from approximately $11 per share in early 2004 to more than $16 per share by the end of that year. The share price continued to rise in 2005, as the stock trade in the high teens for the first half of the year and above $20 at some points during the second half of the year.[16] Ixia's growth began to slow at the end of 2005. Plaintiffs allege that at this point, investors lost their enthusiasm for the stock, which declined in value to roughly $10 per share by the end of November 2005.[17] Ixia's stock price languished in the mid-single digits for the next several years. Miller admitted during a December 4, 2012 conference call that the Ixia was "in a little bit of a rut."

Plaintiffs allege that, as Ixia's stock fell out of favor with investors, the company was forced to restate the way it recognized its software service and warranty contracts. On February 23, 2007, Ixia pur-

---

8. *Id.,* ¶ 21.

9. *Id.,* ¶ 22.

10. *Id.,* ¶ 23.

11. *Id.,* ¶ 26.

12. *Id.*

13. *Id.,* ¶ 18.

14. *Id.,* ¶ 189.

15. *Id.,* ¶ 27.

16. *Id.*

17. *Id.,* ¶ 28.

portedly announced that it was restating its Forms 10–K for the years ended December 31, 2003, 2004, and 2005, as well as Forms 10–Q for quarters ended March 31, 2006 June 30, 2006, and September 30, 2006 (the "2007 restatement").[18] The restatement adjusted revenues, operating results, and deferred revenue because Ixia had recognized too much present revenue from the contracts, and should have deferred a portion of it as required by applicable accounting rules.[19] Miller and Alston were high ranking Ixia officers at the time, and Ginsberg was the company's founder; Bhatnagar joined the company as its COO a few months after the 2007 restatement.[20]

Plaintiffs contend that the decline in Ixia's stock price occurred largely because it had fallen out of favor as a technology "growth" company.[21] By way of example, they allege that in a May 1, 2010 analyst report, Price Target Research noted that "Ixia's growth rate has slowed very considerably in recent years. Annual revenue growth has been 10.6% per year. Total asset growth has been 9.6% per year. (More recently it has been 0.7%). Annual [earnings per share] has been 7.1% per year. Equity growth has been 7.3%. (More recently it has been -6.7%)."[22] Plaintiffs assert that as a result of this lackluster performance, Ixia sought to "reinvigorate investor enthusiasm and drive up the price of its common stock by convincing the public that it was once again a 'growth' company."[23] To accomplish this,

Ixia purportedly employed a variety of unlawful methods, including: "(1) improperly inflating [its] deferred revenues—a common indicator of a Company's growth prospects—in violation of [Generally Accepted Accounting Principles ("GAAP")], so that investors would believe that Ixia's growth would continue into future quarters; (2) promoting Alston to the position of CEO because Ixia's board believed his reputation for being 'aggressive' would accelerate Ixia's growth prospects; and (3) acquiring niche businesses engaged in growth areas."[24]

### 1. Ixia's Focus on Future Growth Potential

Plaintiffs allege that Ixia began to focus on future growth potential after it strategically acquired two small businesses in 2009[25]—Catapult Communications, which designs, develops, manufactures, markets and supports software-based test systems for the telecommunications industry, on June 23, 2009, and the N2X product line from Agilent Technologies for $44 million in cash on October 21, 2009.[26] These acquisitions allegedly piqued the interest of the investment community. On May 19, 2010, Wunderlich Securities reported that data center and core routing product cycles ensured a growth cycle for one of Ixia's newly acquired products. Price Target Research noted on June 6, 2010 that Ixia's growth rate forecast was 20%— "substantially above the average historical growth measures." It also observed, how-

---

18. *Id.,* ¶ 174.

19. *Id.* See also Supplemental Declaration of Eric Rieder in Support of Defendants' Motion to Dismiss ("Supp. Rieder Decl."), Docket No. 93 (Sept. 8, 2014), Exh. 33 at 10 (listing total revenues as initially reported and total revenues as restated).

20. FAC, ¶ 175.

21. *Id.,* ¶ 29

22. *Id.*

23. *Id.,* ¶ 30.

24. *Id.*

25. *Id.,* ¶¶ 31, 38.

26. *Id.,* ¶ 38.

ever, that Ixia's growth rate "ha[d] slowed very considerably in recent years." [27]

Plaintiffs cite numerous other analyst reports from 2010 that focused on Ixia's potential for growth. They note that Morgan Keegan & Co. reported that "Ixia's growth rates of 46% in 2010 (boosted by acquisitions) and 15% in 2011 compare[d] to its test & measurement end market growth rates of 18% and 21% in our estimates, which suggest[ed] that [the] estimates [were] conservative with room for upside." [28] Wunderlich reported on October 22, 2010 that it was "increasing [its estimate of Ixia's] 3–5 year growth rate to 22% from 20%." [29] Capstone analysts met with Ixia management in November 2010; Capstone reported on November 11, 2010, that management "talked about the industry trends providing tailwinds for their product growth," and noted that Wall Street "estimates [were] currently for 16% and 12% [year over year] sales growth for 2011 and 2012." [30] Finally, on November 23, 2010, Wunderlich reported that it believed "most of the upside of Ixia's recent results and guidance represent[ed] the early stage of a demand cycle that [would] be lengthier and larger than what the company had previously experienced, because demand for data ha[d] multiplied . . . and [was] expanding into emerging markets." Wunderlich increased its 3–5 year net income growth rate forecast for Ixia from 22% to 28%.[31]

Plaintiffs allege that during the period Ixia was "building its story as a growth company," analysts were paying close attention to its deferred revenues, and in particular its ability to generate service-based or other types of renewable, recurring revenue.[32] They contend that investors often view deferred revenues as an indication of a company's future health and ability to grow. They cite a May 9, 2010 report by Wunderlich, which stated that it "expect[ed] continued strong software and service maintenance renewals," [33] and a July 21, 2010 analyst report in which Wunderlich commented on Ixia's deferred revenues, stating: "Recent growth in deferred revenue adds visibility. Deferred revenue grew 10.5% sequentially in the March quarter, well ahead of the 2.4% sequential growth we forecast for both product and service revenue." [34] Plaintiffs also note Wunderlich's comment that "Ixia saw little of the service revenue that contributed over 30% of [Catapult's] sales when [it] was an independent company. Much of this was because of the elimination of deferred revenue through acquisition accounting. . . ." Wunderlich reported, however, that it "expect[ed] visibility for maintenance renewals to have improved." [35] Indeed, during a July 22, 2010 analyst conference call, a Wunderlich analyst asked whether Ixia expected the maintenance revenues Catapult had typically earned as an independent company to come back. Miller responded that he believed they would, because the rate of renewals was essentially unchanged, and Ixia would be able to recognize 100% of the renewal revenue that it was initially

27. *Id.,* ¶ 40.

28. *Id.,* ¶ 41.

29. *Id.*

30. *Id.,* ¶ 42.

31. *Id.,* ¶ 43.

32. *Id.,* ¶ 44.

33. *Id.,* ¶ 44.

34. *Id.,* ¶ 45 (emphasis removed).

35. *Id.,* ¶ 46 (emphasis removed).

unable to recognize because of post-acquisition accounting requirements.[36] Plaintiffs assert the analyst's question shows that the market was concerned that Ixia's revenues were too dependent on product-based revenues as opposed to renewable maintenance and service-based revenues.[37]

Wunderlich purportedly continued to focus on deferred revenue for the rest of 2010 and into 2011. During a February 3, 2011 analyst call, a Wunderlich analyst noted that Ixia had "good deferred revenue growth, along with activity decrease in [day sales outstanding]." In response, Miller commented that Ixia was a "very back-end loaded business." The next day, Wunderlich reported that Ixia's "deferred revenue grew the most in a year and [day sales outstanding] declined to the lowest level in more than a year." Specifically, it reported that deferred revenue was up 11.9%—"the strongest sequential comparison since the 4Q09 N2x acquisition."[38]

Plaintiffs contend that Deutsche Bank also "bought in" to Ixia's growth story; it observed in a February 3, 2011 report that although Ixia was trading at a premium in comparison with its peers, the premium was "merited by [Ixia's] leadership position in the test equipment market and by the current network upgrade cycle."[39] Deutsche Bank also stated that Ixia continued to benefit from "several growth trends," including consolidation of data centers, a shift toward cloud-based computing, and growth in mobile data.[40]

## 2. Allegations of Fraudulently Inflated Deferred Revenue in Quarterly and Annual Reports

Plaintiffs contend that simply acquiring new businesses was not sufficient to permit Ixia to grow. They assert that at some point during 2010, Ixia began fraudulently to inflate its deferred revenue to convince investors of its capacity for sustained growth, and that it continued the practice throughout the class period.[41] Plaintiffs contend that on April 3, 2013, Ixia announced that deferred revenues had been inflated throughout the class period, and that its Audit Committee had recommended that it restate previously issued financial statements ("the first restatement").[42] Ixia's Form 10–K for 2010, which was filed February 3, 2011, is the earliest of Ixia's public statements that was restated. In it, Ixia reported total revenue of $276.8 million, an increase of 56% from the prior year, and deferred revenue of $46.7 million for the year 2010.[43] The restatement revealed that deferred revenues had been artificially inflated, and total revenues deflated.[44] Plaintiffs allege that had Ixia properly accounted for deferred earnings, it would have reported an additional 14% increase in net income. Although Ixia reported that the restatement "affect[ed] ... deferred revenues," it did not state how much deferred revenue for 2010 had been inflated.[45]

On April 21, 2011, Ixia held an analyst call to announce earnings for the first quarter of 2011. It reported that revenues

---

**36.** *Id.,* ¶ 47.

**37.** *Id.*

**38.** *Id.,* ¶ 49 (emphasis removed).

**39.** *Id.,* ¶ 50.

**40.** *Id.*

**41.** *Id.,* ¶ 31.

**42.** *Id.,* ¶¶ 8, 35.

**43.** *Id.,* ¶ 109.

**44.** *Id.,* ¶ 51, 111.

**45.** *Id.,* ¶ 112.

had exceeded expectations, growing to a record $78.5 million; in addition, it reported deferred revenue of $45.2 million.[46] The first restatement allegedly later revealed that deferred revenues were artificially inflated.[47] Had correct revenue figures been used, Ixia's net income would allegedly have declined by $.472 million, from $7.1 million to $6.6 million. Once again, Ixia's restatement did not reflect the amount by which deferred revenues for the first quarter of 2011 had been inflated.[48]

During the April 21 conference call, Ixia allegedly continued to encourage investors to view it as a growth company. Then-CEO Bhatnagar stated that Ixia was "excited about [its] market positioning, as well as the opportunities [it] [saw] for future growth and global expansion." [49] He also purportedly told a Deutsche Bank analyst that the company continued to expect growth of 15–20% in its core businesses.[50] Deutsche Bank later highlighted the fact that Ixia "made a point to say [that it had] the ability to grow both organically and inorganically." [51] Capstone also focused on Ixia's growth, remarking that Ixia "may be growing faster than the market, as well as gaining additional revenue cross selling other products to its existing customers." [52] Plaintiffs allege that Ixia continued to promote its story of growth by acquiring VeriWave, a privately held wire-

less LAN testing equipment company, on June 27, 2011.[53]

On July 6, 2011, Ixia purportedly announced ahead of its earnings report that it expected to miss expectations for the second quarter of 2011.[54] Ixia's stock price fell 24% from a closing price of $13.01 on July 7, 2011 to $9.90 on July 8, 2011.[55] Capstone questioned whether this was merely a "road bump or [a] major detour" on July 8. Wunderlich noted in a report the same day that Ixia "[did] not benefit from the flywheel effect of a strong subscription revenue base," because "more than 80%" of its revenue came from product sales.[56] Plaintiffs assert these analyst comments increased the pressure on Ixia to paint a positive picture of its capacity to generate recurring revenue from subscription-based services like maintenance.[57] Thus, on July 21, 2011, after the close of trading, Ixia reported total second quarter 2011 revenue of $69 million, down from the prior quarter, and record deferred revenues of $49.9 million, up 10.3% from the first quarter of 2011, and 22.7% from the second quarter 2010.[58] Ixia's stock price remained relatively unchanged after the substantial loss caused by the pre-announcement that Ixia had missed its earnings guidance.[59] Plaintiffs allege that the deferred revenue reported was inflated, and was subsequently adjusted in the first restatement.[60] In particular, they assert

46. *Id.*, ¶ 113.

47. *Id.*, ¶ 52.

48. *Id.*, ¶ 115.

49. *Id.*, ¶ 53.

50. *Id.*

51. *Id.*, ¶ 54.

52. *Id.*

53. *Id.*, ¶ 55.

54. *Id.*, ¶ 57.

55. *Id.*, ¶ 117.

56. *Id.*

57. *Id.*

58. *Id.*, ¶¶ 58, 59, 118.

59. *Id.*, ¶ 119.

60. *Id.*, ¶ 59, 120.

that Ixia should have reported an increase in net income, and diluted earnings per share of $.02 cents instead of $.01 cents.[61] The first restatement did not report how much deferred revenue had been overstated; it simply noted that the restatement "affect[ed] . . . deferred revenues."[62]

Miller and Bhatnagar also allegedly made statements focusing on deferred revenue during this period. During a conference call on July 21, 2011, Miller allegedly stated that there were deals Ixia hoped to pull out of deferred revenues in the next quarter; plaintiffs assert his statement served to reinforce investors' belief that deferred revenues were an indicator of the company's future success.[63] Bhatnagar said he believed there was more room for growth; he stated that wireless traffic was doubling and that, that, despite the potential for a "blip" here and there, Ixia was poised for "very solid growth" over the next three to four years.[64] Plaintiffs allege these statements were an attempt to convince investors that Ixia would have solid, sustainable, and overall smooth growth. Following the conference call, Deutsche Bank reported on July 22, 2011 that management had reassured investors that the company's business trends were intact and that the major technology transitions relevant to its core operations still had momentum. Plaintiffs assert Ixia's announcement of high deferred revenues defrayed analysts' concerns following the negative earnings announcement.[65] They note

Wunderlich reported that the decline in revenues "was a function of . . . deferred revenue growth, which was up 22.7% [year over year] and 10.3% sequentially; this was well more than the $0.16 per share of earnings that was expected before the preannouncement" of a negative quarter.[66]

On October 20, 2011, Ixia held an analyst call to report third quarter 2011 earnings.[67] It stated that revenue had increased to $77.3 million, "at the higher end of [the] guidance," reflecting 9% year-over-year growth compared with the same quarter in 2010.[68] It also reported deferred revenue of $49.2 million—an 18% increase from the third quarter of 2010.[69] Wunderlich and Capstone greeted this information enthusiastically. Wunderlich reported that the "June quarter miss look[ed] like a hiccup instead of a heart attack," while Capstone stated that the "Q2 miss appear[ed] . . . to be short lived."[70] Plaintiffs allege that in reality, the company's deferred revenue was artificially inflated, as the first restatement later revealed.[71] Even after restating its financials, they charge, Ixia did not report the amount by it had overstated deferred revenue.[72]

They assert that the first restatement confirmed that Ixia's inflation of deferred earnings continued into the fourth quarter of 2011.[73] Ixia reported deferred revenue for the fourth quarter of $51.1 million—up

61. *Id.,* ¶ 121.

62. *Id.,* ¶ 121.

63. *Id.,* ¶ 60.

64. *Id.,* ¶ 61.

65. *Id.,* ¶¶ 61–62.

66. *Id.,* ¶ 62.

67. *Id.,* ¶ 65

68. *Id.* ¶¶ 65, 122.

69. *Id.,* ¶ 122.

70. *Id.,* ¶ 66.

71. *Id.*

72. *Id.,* ¶ 125.

73. *Id.,* ¶ 67.

9.4% from the same quarter in 2010.[74] It also reported total revenue for fiscal 2011 of $308.4 million, an increase of 11%.[75] These revenues and the company's earnings per share exceeded guidance and analyst expectations.[76] Ixia's stock rose 14% on this news, from a close of $12.74 on February 2, 2012, to a close of $14.55 on February 3, 2012.[77] Plaintiffs contend, however, that once again, the numbers were artificially inflated and would be corrected in the first restatement.[78] Deferred revenues for the fourth quarter should only have been $43.02 million—18.7% lower than the number reported. Plaintiffs allege this was done to mislead investors and cause then to believe that Ixia was a growth company due at least in part to recurring revenue streams.[79] They maintain that, properly reported, total net income for the fiscal year would have increased by $2.9 million, from $23.8 million to $26.7 million.[80]

On March 15, 2012, Ixia announced it was replacing Bhatnagar with Alston, effective May 1, 2012.[81] Alston was allegedly instrumental in defining Ixia's strategy and identifying acquisitions; replacing Bhatnagar with Alston was purportedly a move intended to further enhance investor perceptions of Ixia as a growth company.[82] Wunderlich expressed surprise, but noted that Ixia's board saw potential for "even speedier execution with Alston in charge." [83]

On April 19, 2012, Ixia announced total revenue of $85.6 million for the first quarter of 2012; it also reported deferred revenues of $57 million.[84] Ixia's stock rose 9.1%, closing on April 19, 2012 at $11.21, and the following day at $12.23.[85]

Deutsche Bank noted that Ixia had beat analysts' consensus number of $83.5 million; Gabelli & Company, Inc. observed that the company's solid growth trend was expected to continue; and Wunderlich remarked on Ixia's "strong balance of deferred revenue [which could] diminish[ ] head-line risk for the current quarter." [86] Plaintiffs allege that Ixia's deferred revenue was inflated, as the first restatement later revealed that deferred revenue for the first quarter of 2012 should have been $47.9 million, 18% less than the $57 million initially reported. Net income should purportedly have been $5.2 million—an increase of 15.2% [87]

Plaintiffs also allege that Ixia made two more acquisitions in 2012. On May 4, 2012, it announced that it acquired Anue Systems, Inc. for $154.4 million, and on July 2, 2012, it announced that it acquired Breaking Point Systems.[88] Plaintiffs assert that while these acquisitions may have signaled to investors that Ixia wanted to grow, it was the deferred revenue it reported that provided "factual and quantifi-

---

**74.** *Id.,* ¶ 126.

**75.** *Id.*

**76.** *Id.,* ¶ 67.

**77.** *Id.,* ¶ 128.

**78.** *Id.,* ¶ 67, 129.

**79.** *Id.,* ¶ 130.

**80.** *Id.,* ¶ 131.

**81.** *Id.,* ¶ 68.

**82.** *Id.*

**83.** *Id.,* ¶ 69.

**84.** *Id.,* ¶¶ 74, 132.

**85.** *Id.,* ¶ 134.

**86.** *Id.,* ¶¶ 74–76.

**87.** *Id.,* ¶ 77, 136–37.

**88.** *Id.,* ¶ 78.

able evidence" that it could grow. Absent the reporting of inflated deferred revenue, plaintiffs contend, the acquisitions alone would not have convinced investors that Ixia was a growth company.[89]

Ixia purportedly continued to report inflated deferred revenue during the remainder of 2012. On July 26, 2012, it announced second quarter results. These included revenue of $92.3 million and deferred revenue of $62.5 million, up 9.8% from the prior quarter, and 25.3% over the same quarter in 201 1.[90] Plaintiffs assert that analysts were "generally pleased" with these results, commenting that the company's "[g]rowth [did] not appear to be slowing," that it had provided full year guidance for 2012 and 2013 that "reiterate[d] [its] belief in [its] growth prospects," and that management was "optimistic" about the company's growth trajectory for 2012.[91] The first restatement, however, later revealed that deferred revenue had once again been inflated, and that it should have been $55.1 million or 13.4% lower.[92] They also assert that actual revenue was overstated, and that, had the correct revenue figure been used, the company's net income would have declined by $1.2 million.[93]

Ixia announced third quarter 2012 results on October 24, 2012. It reported revenues of $109.6 million, and record deferred revenues of $76.8 million—up 22.8% from the prior quarter, and 56% form the third quarter 2011.[94] Plaintiffs allege these figures were false and misleading because the first restatement revealed that Ixia's deferred revenues were actually only $68.3 million, or 12.4% lower than the $76.8 million they initially reported.[95] Net income also would have declined by $0.5 million, from $11.4 million to $10.9 million, if properly accounted for.[96]

On February 6, 2013, Ixia announced yet another record breaking quarter. It reported that fourth quarter revenue was $124 million, up 48% from the same quarter in 2011.[97] Ixia noted that its "core businesses" had generated record revenue—up 12% from the prior year and 16% for the year.[98] It also reported deferred revenue of $74.8 million—up 46.5% from the fourth quarter 2011. Plaintiffs allege that the first restatement later revealed that this figure had been artificially inflated, although it did not provide the correct amount.[99]

### 3. Misstatements Concerning Internal Controls

Plaintiffs also allege that Ixia made misstatements concerning its internal controls. Specifically, they allege that Ixia made the following statement in each Form 10–Q that it filed during the restated periods:

> There have not been any changes in our internal control over financial reporting (as such term is defined in Rules 13a–15(f) and 15d–15(f) under the Exchange Act) during the fiscal quarter ... that have materially affected, or are reason-

89. *Id.*

90. *Id.,* ¶¶ 79, 138.

91. *Id.,* ¶ 80.

92. *Id.,* ¶ 81.

93. *Id.,* ¶ 142.

94. *Id.,* ¶ 143.

95. *Id.,* ¶¶ 81, 146.

96. *Id.,* ¶ 147.

97. *Id.,* ¶ 88.

98. *Id.*

99. *Id.,* ¶ 89.

ably likely to materially affect, our internal control over financial reporting.[100]

Plaintiffs assert this statement was materially false and misleading because Ixia announced on April 3, 2013, as discussed in more detail *infra*, that there had been material weaknesses in its internal controls over revenue recognition related to software maintenance and warranty contracts.[101] They contend Ixia's 2010 and 2011 Forms 10–K were also false and misleading, in that they represented management had concluded that the company's internal controls over financial reporting were effective as of December 31, 2010." On April 3, 2013, however, Ixia acknowledged that there were material weaknesses in its internal controls. It stated that "the Company [had] not maintain[ed] effective disclosure controls and procedures and internal control over financial reporting as of December 31, 2012 because of . . . material weaknesses related to the accuracy with which the Company had historically recognized revenues related to its warranty and software maintenance contracts and arrangements."[102]

Plaintiffs allege that each Form 10–Q issued during the restated periods was signed and certified under § 302 of the Sarbanes–Oxley Act of 2002 by either Bhatnagar or Alston, and that Alston, Miller, and Bhatnagar were responsible for establishing and maintaining disclosure controls and procedures, and internal controls over financial reporting. They assert that, by signing the quarterly reports on Form 10–Q, each of them represented that the company's internal controls and procedures were adequate and that they had designed appropriate disclosure controls and procedures over financial reporting.[103]

#### 4. The First Restatement

Plaintiffs contend the truth behind Ixia's "growth story" began to emerge on March 19, 2013, when Ixia announced that it had filed a Form 12b–25 with the SEC concerning its annual Form 10–K for the year ended December 31, 2012, and had to delay the filing of its annual report to "correct an error related to the manner in which [it] recognize[d] revenues for its warranty and software maintenance contracts."[104] On April 3, 2013, Ixia's management recommended to the Board's Audit Committee that Ixia restate previously issued financial statements for the fiscal years ended December 31, 2011 and 2010, and fiscal quarters ended March 31, 2011, June 30, 2011, September 30, 2011, March 31, 2012, June 30, 2012, and September 30, 2012 (the "restated periods"). It advised that the public could no longer rely on those financial statements.[105] On April 8, 2013, Ixia issued a press release to this effect.[106] Ixia also acknowledged that

---

100. *Id.,* ¶ 151.

101. *Id.,* ¶ 152.

102. *Id.,* ¶¶ 153–54.

103. *Id.,* ¶ 156.

104. *Id.,* ¶ 90.

105. *Id.,* ¶¶ 8, 91.

106. *Id.,* ¶ 93 ("The errors that require the restatement of our previously issued financial statements relate to the manner in which the

Company recognizes revenues related to its warranty and software maintenance contracts, including a previous implied warranty and software maintenance arrangement with one of the Company's customers. . . . The changes in the Company's revenue recognition practices will generally result in a shift of revenues between accounting periods in our previously issued financial statements, and will not have any impact on the total revenues recognized over the life of a warranty and software maintenance contract or arrangement, although the timing of the recognition of such revenues will generally commence earlier and end earlier than was reflected in

there had been material defects in its internal controls during the restated periods.[107] Plaintiffs assert the announcement and press release show that Ixia had violated Regulation S–X, Item 303.[108] This rule requires certain supplemental disclosures in quarterly and annual financial statements to help investors better understand a company's financial condition.[109] Plaintiffs contend that by inflating deferred revenues, Ixia failed to disclose the effect that its accounting for implied warranty and maintenance contracts had on its trends and liquidity; it also purportedly created the false impression that deferred revenues were in line with its book-to-bill ratios,[110] and that its operating and liquidity risks for future quarters were insignificant.[111] Plaintiffs also allege that the inflated deferred revenue and deflated actual revenue reported violated several fundamental principles of GAAP.[112] They contend that Ixia's misstatements "could not have been inadvertent errors, nor could they have been the result of confusing or gray-area accounting policies." [113] Rather, Ixia purportedly violated GAAP rules that are followed by all software

our previously issued financial statement for the Restated Period'').

107. *Id.,* ¶ 94 (''Management has concluded and the Company expects to disclose in its 2012 Form 10–K that the Company did not maintain effective disclosure controls and procedures and internal control over financial reporting as of December 31, 2012 because of the identified material weaknesses related to the accuracy with which the Company had historically recognized revenues related to its warranty and software maintenance contracts and arrangements. Specifically, the Company did not design a control to compute and assess the significance of the difference between its revenue recognition practices related to the Company's warranty and software maintenance contracts and the revenues that would have been recognized using the appropriate accounting principles generally accepted in the United States of America. The Company also did not design a control to review changes to its previous implied warranty and software maintenance arrangement with one of its customers to properly determine the impact of revenue recognition when the implied arrangement ceased to exist'').

108. *Id.,* ¶ 148.

109. *Id.*

110. A company's ''book-to-bill ratio'' is the ratio of orders received to units shipped and billed in a particular period. (*Id.*) It is used by investors to assess the future revenue outlook. A ratio of 1 or more implies that more orders were received than filled, which in turn indicates strong demand. (*Id.*)

111. *Id.,* ¶ 149.

112. *Id.,* ¶ 150. These include: (i) the principle that financial reporting should provide information that is useful to present and potential future investors and creditors in making rational investment and credit decisions, FASB Statement of Concepts No. 1, ¶ 34; (ii) the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to the resources, FASB Statement of Concepts No. 1, ¶ 40; (iii) the principle that financial reporting should provide information about how the management of an enterprise has discharged its responsibility to stockholders in using the enterprise resources entrusted to it, FASB Statement of Concepts No. 1, ¶ 50; (iv) the principle that financial reporting should provide information about an enterprise's financial performance during a period, including past performance, FASB Statement of Concepts No. 1, ¶ 42; (v) the principle that financial reporting should be reliable in the sense that it represents what it purports to represent, FASB Statement of Concepts No. 2, ¶¶ 58–59; and (vi) the principle of completeness, i.e., that nothing is omitted from public disclosures that may be necessary to insure that other public statements accurately represent underlying events and conditions, FASB Statement of Concepts No. 2, ¶ 79. (*Id.,* ¶ 150.)

113. *Id.,* ¶ 97.

companies that have "multiple element arrangements," i.e., contracts that include a service-based component, i.e., technical support, warranty, and software maintenance.[114]

Many of Ixia's product sales include up to one year of technical support, warranty, and software maintenance; customers can choose to extend the services for annual or multi-year periods thereafter.[115] Ixia recognized revenues on its products on a "straight-line basis" over the contractual or estimated period during which services were to be rendered. The first restatement made two corrections to Ixia's revenue recognition on such arrangements. These were identified as (1) an accounting practice error; and (2) an implied arrangement error.[116] The accounting practice error involved the time at which Ixia recognized revenue from a new contract. In its original financial statements, Ixia failed to recognize revenue when it had evidence of a contract. This overstated deferred revenues on its balance sheet and understated revenue on its statement of operations. Plaintiffs allege that any competent accounting professional would have known revenue should be recognized as soon as there was evidence of a contract, assuming other criteria for revenue recognition were met. As a result, they assert, the accounting practice error could not have been the product of inadvertence or mistake.[117]

The implied arrangement error concerned revenues generated by one of Ixia's largest customers, Cisco. The company initially recorded deferred implied warranty and software maintenance revenue based on estimated amounts and estimated times of receipt.[118] When it entered into an actual contract with Cisco, it should purportedly have adjusted these amounts based on the terms of the contract. Plaintiffs allege that, had Ixia made such an adjustment, it would immediately have reduced deferred revenue on its balance sheet and recognized additional revenue on its statement of operations.[119] As with the accounting practice error, plaintiffs assert the accounting was straightforward and that any competent accounting professional with experience in the software industry would have used the correct methodology.[120]

In response to the company's announcement of the first restatement, Ixia's share price dropped by 9.55%, from a closing price of $20.31 on April 3, 2013, to a closing price of $18.37 on April 4, 2013.[121]

On May 3, 2013, following announcement of the first restatement, Ixia reported that its auditor, PricewaterhouseCoopers LLP ("PwC") had "decline[d] to stand for reappointment as [Ixia's] independent registered public accounting firm for the fiscal year ending December 31, 2013."[122]

On October 24, 2013, Ixia announced that Alston had resigned as CEO following a finding by the Audit Committee that he had misrepresented his academic credentials, his age and early employment history.[123] Plaintiffs assert the fact that Alston lied about his education and employment history shows that he was willing to "take

---

114. *Id.*, ¶¶ 97–98.

115. *Id.*, ¶ 98.

116. *Id.*

117. *Id.*, ¶ 99.

118. *Id.*, ¶ 100.

119. *Id.*

120. *Id.*

121. *Id.*, ¶ 8.

122. *Id.*, ¶ 9.

123. *Id.*, ¶¶ 10, 36.

unscrupulous measures" to further his goals, including portraying Ixia as a growth company. They contend that Ixia's decision to terminate Alston based on purported misrepresentations that had occurred ten years earlier, rather than for fraud, was no more than a "feeble, superficial attempt" to conceal the fact that he had been involved in the fraudulent scheme that had necessitated the first restatement.[124]

### 5. The Second Restatement

On March 5, 2014, Ixia announced in a Form 8–K filed with the SEC that its Audit Committee had completed an internal investigation and that certain of its financial statements would have to be restated as a result of the investigation. On April 11, 2014, Ixia announced the results of the investigation, and described the forthcoming second restatement as follows:

"[T]he Company's management and the Audit Committee concluded that the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10–Q for the quarters ended March 31, 2013 and June 30, 2013 should no longer be relied upon, and should be restated due to the following errors:

For certain sales transactions, ... [Ixia] improperly recognized product revenues when the additional products were shipped rather than deferring a portion of the consideration and recognizing the related revenues over the remaining term of the applicable fixed fee, multi-year extended maintenance and warranty arrangements. For certain other sales transactions, the Company recognized product revenues prematurely (I)

in advance of delivering certain product functionality or other deliverables that were committed to be provided to the customers or. (ii) due to an incorrect assessment of certain multiple-element arrangement sales transactions which included professional services that were provided based on a purchase order separate from the product purchase order but that were negotiated concurrently with the customer.

. . .

The correction of these errors is expected to reduce total revenues by approximately $2.0 million and $4.5 million for the quarters ended March 31, 2013 and June 30, 2013, respectively." [125]

Plaintiffs assert that the second restatement "sheds further light" on defendants' fraudulent scheme to inflate deferred revenues and create the illusion that Ixia was a growth company.[126] They contend that during periods of accelerating revenue growth, Ixia "managed" the growth by improperly deferring revenue and moving it into future periods.[127] The revenue growth was purportedly driven, in large part, by Ixia's acquisition of new companies. Plaintiffs assert that had the revenue from the acquired companies been removed, and only Ixia's "organic revenue" been considered, the company's revenue would have begun to decline, year over year, in the third quarter of 2012.[128] This revenue slide allegedly turned negative during the first two quarters of 2013.[129] Plaintiffs assert that, "to mask this decline," Ixia recognized more revenue than it should have during the first two quar-

124. *Id.*

125. *Id.,* ¶ 102.

126. *Id.,* ¶ 103.

127. *Id.*

128. *Id.,* ¶ 104.

129. *Id.,* ¶ 105.

ters of 2013.[130] Ixia was able to do this, they contend, because it had inflated deferred revenue in prior quarters. Thus, it was able to draw on those reserves and inflate revenue for the first two quarters of 2013.[131]

The second restatement reflected that the decline in year-over-year and quarter-over-quarter organic revenue was steeper than originally reported. Revenue for the first quarter of 2013 was 13.1% lower than for the fourth quarter 2012; revenue for the second quarter of 2013 was 5.2% lower than for the first quarter of 2013.[132] Year-over-year results showed a similar decline of 5% for the first quarter of 2013 and 9.9% for the second quarter of 2013.[133]

### 6. Insider Trading

Plaintiffs also allege that the individual defendants engaged in insider trading.[134] Specifically, they assert that on March 6, 2013, less than two weeks before the first restatement was issued, Alston sold 44,504 shares of Ixia common stock at approximately $21.50 per share, netting almost $1 million.[135] Plaintiffs contend that Alston "had no discernible usual trading practices," and that "these trades were unusual for him," given that they represented 42.2% of his Ixia shares at the time. Plaintiffs assert the fact that he "unloaded" so many shares of stock just prior to announcement of the first restatement is indicative of scienter. They also allege that Alston realized a large gain from stock sales he made and options he exercised at the start of the class period; in

February and March 2011, he sold 85,690 shares for proceeds of almost $1.43 million.[136] Other than these sales, plaintiffs contend, Alston never sold more than 2,000 shares in any given month. They contend that this too is indicative of scienter.[137]

Plaintiffs allege that Ginsburg also profited from suspicious trades he made in May 2011 and February 2013.[138] Specifically, they assert that Ginsburg was able to capitalize on Ixia's strong April 21, 2011 earnings report, which inflated deferred revenue and drove up Ixia's share price by nearly 5%. Between May 3 and May 6, Ginsburg sold 75.82% of his shares, netting more than $1.9 million. In addition to capitalizing on the strong April 2011 earnings report, Ginsburg avoided losses from the 24% share price drop that followed the company's announcement of disappointing second quarter 2011 results on July 7, 2011.[139] Plaintiffs contend that the trades were "highly unusual" for Ginsburg, and that they were his only sales during the class period.[140]

Finally, plaintiffs allege that Miller too engaged in suspicious trading. They note that he sold more than 122,000 shares between February 7 and February 18, 2011, just prior to the start of the class period, netting $1.97 million. They assert that, like Ginsburg, Miller avoided the losses associated with Ixia's July 7, 2011 announcement that it would not meet its guidance for the second quarter of 2011, selling 50,741 shares, or 36.75% of his

---

**130.** *Id.,* ¶ 107.

**131.** *Id.,* ¶¶ 105–06.

**132.** *Id.,* ¶ 108.

**133.** *Id.*

**134.** *Id.,* ¶¶ 158–169.

**135.** *Id.,* ¶ 159.

**136.** *Id.,* ¶ 160.

**137.** *Id.,* ¶ 161.

**138.** *Id.,* ¶ 162.

**139.** *Id.*

**140.** *Id.,* ¶ 164.

holdings, between April 27 and May 16, 2011.[141] Finally, they contend that two months prior to announcement of the first restatement, on February 7 and March 5, 2013, he sold 34,741 shares—or 25% of his holdings and netted $722,400.[142] Other than these sales, Miller did not sell more than 1,300 shares in any given month.[143]

Plaintiffs contend that the sales made by Alston, Ginsburg, and Miller coincide with some of the peak prices of Ixia's stock, and that they were made shortly before precipitous stock price declines.[144]

### 7. The Confidential Witnesses ("CWs")

Plaintiffs also allege that they interviewed certain confidential witnesses ("CWs"). CW1 worked at Ixia's corporate headquarters in Calabasas from September 2007 to January 2014.[145] He was the company's international finance manager during this period, and reported to corporate comptroller, Andalon Candelario. Candelario, in turn, reported to Miller. CW1 was responsible for international financial reporting within Ixia.[146] CW2 began working at Ixia in 1998; CW2 began as an office manager, became a sales administrator, and later served as director of inside sales. In 2006, CW2 was promoted to senior business systems analyst and reported to the senior director of quality, Mike Glish, who in turn reported to the vice president of operations, Raymond de Graaf.

CW1 allegedly reported that Ixia hired an expert in recognizing revenue from software and maintenance contracts, Will Liang, and that Liang was ultimately appointed director of accounting.[147] CW1 also purportedly stated that "everyone above Will Liang" would "have been involved in any decision about how to recognize revenue relating to Ixia's software and maintenance contracts." [148] Plaintiffs contend that CW2 "confirmed" Will Liang was hired as "director of revenue recognition" in 2007.[149]

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127

141. *Id.*

142. *Id.*, ¶ 166.

143. *Id.*, ¶ 167.

144. *Id.*, ¶ 169.

145. *Id.*, ¶ 172.

146. *Id.*

147. *Id.*, ¶ 176.

148. *Id.*

149. *Id.*

S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"); see also *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995). The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); see also *Twombly*, 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.2009).

### B. Requests For Judicial Notice

Both plaintiffs and defendants ask that the court take judicial notice of various documents. Because Rule 12(b)(6) review is confined to the complaint, the court typically does not consider material outside the pleadings (e.g., facts presented in briefs, affidavits, or discovery materials) in deciding such a motion. *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d 1524, 1537 (9th Cir.1996). It may, however, properly consider exhibits attached to the complaint and documents whose contents are alleged in the complaint but not attached, if their authenticity is not questioned. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001).

In addition, the court can consider matters that are proper subjects of judicial notice under Rule 201 of the Federal Rules of Evidence. *Id.* at 688–89; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002); *Hal Roach Studios, Inc.*, 896 F.2d at 1555 n. 19; see also *Tellabs*, 551 U.S. at 322, 127 S.Ct. 2499 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[150] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir.1998).

### 1. Defendants' Request for Judicial Notice

■ Defendants ask that the court take judicial notice of several of Ixia's SEC

---

**150.** Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC* *Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986).

filings.[151] Courts can consider securities offerings and corporate disclosure documents that are publicly available. See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir.2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available financial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper").

In addition, defendants ask that the court take judicial notice of Ixia's class period stock price.[152] Because publicly traded companies historical stock prices can be readily ascertained and those prices are not subject to reasonable dispute, courts routinely take judicial notice of them. See *Patel v. Parnes*, 253 F.R.D. 531, 547–48 (C.D.Cal.2008) (judicially noticing historical stock prices because such information is capable of accurate and ready determination); *In re Homestore.com Inc. Sec. Litig.*, 347 F.Supp.2d 814, 816 (C.D.Cal.2004) ("[A] court may take judicial notice of a company's published stock prices").

Additionally, courts can consider documents that are referenced in the complaint under the "incorporation by reference" doctrine. *In re Stac Electronics Securities Litigation*, 89 F.3d 1399, 1405 n. 4 (9th Cir.1996) (discussing securities offering documents); see also *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir.1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint), superseded by statute on other grounds; *In re Copper Mountain Sec. Litig.*, 311 F.Supp.2d 857, 864 (N.D.Cal.2004) (taking judicial notice of an analyst report that was referenced in the complaint); *In re Northpoint Communications Group, Inc. Securities Litigation*, 184 F.Supp.2d 991, 994 n. 1 (N.D.Cal. 2001) ("In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure" (citations omitted)).

The complaint references many of Ixia's SEC filings, as well as multiple analyst reports. The court will therefore consider the SEC filings, analyst reports, and data concerning Ixia's share price that defendants have proffered.[153]

---

**151.** Ixia's Request for Judicial Notice ("Ixia RJN"), Docket No. 84 (July 18, 2014) at 9, Exhs. 1–22. Ixia also filed a supplemental request for judicial notice, asking that the court take judicial notice of two Form 8–K filings by Ixia on February 23, 2007 and May 9, 2013. (Ixia's Supplemental Request for Judicial Notice, Docket No. 95 (Sept. 8, 2014).) In addition to the fact that the Forms 8–K are public filings, and thus proper subjects of judicial notice, plaintiffs rely on the documents in their opposition, and incorporate them by reference in the complaint. (See Opposition at 1, 3, 17; FAC, ¶¶ 9, 174–76.) Accordingly, the court will consider these documents in deciding the motion.

**152.** *Id.* at 9.

**153.** The court takes judicial notice of the SEC filings only for their existence and contents, not for the truth of the information contained in them. See *In re Foundry Networks, Inc.*, C 00–4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D.Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D.Cal. 2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi

### 2. Plaintiffs' Request for Judicial Notice

■ The parties dispute whether the court may properly consider certain Forms 4 that the individual defendants filed with the SEC during the class period. Plaintiffs seek to have the court take judicial notice of the documents.[154] Because the documents are SEC filings, they are proper subjects of judicial notice. Defendants contend, however, that the court should decline to take judicial notice of the documents because plaintiffs are attempting to use them to supplement allegations included in the complaint. Although plaintiffs assert that they relied on the documents in pleading certain of their allegations, they did not include other facts that are referenced in their opposition to the motion to dismiss.[155] Plaintiffs cannot utilize the documents to amend the complaint and defeat defendants' motions to dismiss. See *In re Turbodyne Technologies, Inc. Sec. Litig.,* No. CV99–00697–MMM–BQRx, 2000 WL 33961193, *10 (C.D.Cal. Mar. 15, 2000) ("Plaintiffs' complaint alleges much of the information contained in Exhibit Q, including Turbodyne's stock price on certain days and the dates the stock's upward and downward price swings began. The complaint lacks any allegations regarding Turbodyne's daily trading volume, however, and plaintiffs clearly seek to have the court take judicial notice of Exhibit Q to cure this omission. In deciding a motion to dismiss, courts may not 'take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).' The effect of

plaintiffs' request that the court take judicial notice of Exhibit Q is the same, and the court declines to do so for that reason" (internal citation omitted)). Consequently, the court declines to take judicial notice of the individual defendants' Forms 4.

### C. Legal Standard Governing the Pleading of Securities Fraud Claims

■ Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV. PROC. 9(b). A securities fraud claim cannot survive a motion to dismiss under Rule 9(b) merely by alleging that certain statements were false. *Metzler,* 540 F.3d at 1070 ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet th[e Rule 9(b) ] standard"); see also *In re Oracle Corp. Securities Litigation,* 627 F.3d 376, 390 (9th Cir. 2010) ("Plaintiffs must 'demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression,'" quoting *In re Convergent Technologies Securities Litigation,* 948 F.2d 507, 512 (9th Cir.1991)). Rather, the complaint must allege "why the disputed statement was untrue or misleading *when made." In re GlenFed Inc. Securities Litigation,* 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (emphasis added).

In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, which amended the Secu-

---

public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice").

**154.** Plaintiffs Request for Judicial Notice, Docket No. 89–1 (Aug. 18, 2014).

**155.** Defendants' Opposition to Request for Judicial Notice, Docket No. 92 (Sept. 8, 2014) at 1–2 (citing Plaintiffs' Request for Judicial Notice at 1–2).

rities Exchange Act of 1934. The PSLRA modified Rule 9(b)'s particularity requirement, "providing. that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); see *Silicon Graphics*, 183 F.3d at 996. The statute requires, with respect to pleading that each allegedly misleading statement or omission was made with scienter, that plaintiff "state with particularity ... facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A).[156]

■ In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b–5.'" *Tellabs*, 551 U.S. at 320, 127 S.Ct. 2499 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006)). The PSLRA's requirements "prevent[ ] a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061 (citing *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir.2002)).

## D. Legal Standard Governing Liability Under Section 10(b) and Rule 10b–5

Rule 10b–5, promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically, one cannot "(a) ... employ any device, scheme, or artifice to defraud; (b) ... make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

■ The elements of a section 10(b) or Rule 10b–5 violation are (1) a misrepresentation or omission of a material fact, (2) scienter, (3) reliance (4) a connection with the purchase or sale of a security, (5) economic loss, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); see also *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996) (en banc); *McCormick v. Fund American Companies, Inc.*, 26 F.3d 869, 875 (9th Cir.1994).

**156.** The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without actual knowledge of their falsity. 15 U.S.C. §§ 77z–2(c), 78u–5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z–2(i), 78u–5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v. Haggerty*, 38 F.Supp.2d 816, 830 (C.D.Cal. 1998).

**1352**

As noted, the complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). In addition to pleading falsity adequately, the pleading must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, ... the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young,* 641 F.3d 1089, 1095 (9th Cir.2011) (citing *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991–92 (9th Cir.2009)).

The Ninth Circuit has also emphasized that "plaintiffs 'must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct.'" *Middlesex Retirement System v. Quest Software Inc.,* 527 F.Supp.2d 1164, 1179 (C.D.Cal.2007) (quoting *Silicon Graphics,* 183 F.3d at 974); see also *Silicon Graphics,* 183 F.3d at 977 ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct"). The requisite state of mind must be a " 'departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.' " *Zucco Partners,* 552 F.3d at 991 (quoting *Silicon Graphics,* 183 F.3d at 984). If plaintiffs rely on allegations of recklessness, the pleading standard requires that they "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics,* 183 F.3d at 979. Allegations of mere negligence are insufficient. *Glazer Capital Management, LP v. Magistri,* 549 F.3d 736, 748 (9th Cir.2008) ("At most, it creates the inference that he *should have known* of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.,* No. 10–CV–03451–LHK, 2011 WL 3501733, *7 (N.D.Cal. Aug. 10, 2011) ("[T]he Ninth Circuit defines 'recklessness' as a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it").

"To qualify as 'strong' within the intendment of ... the PSLRA ... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent.*" *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499 (emphasis added). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss.... The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual al-

legation, scrutinized in isolation, meets that standard." *Id.* at 322–23, 127 S.Ct. 2499 (emphasis original).

■ In determining whether plaintiffs have alleged facts showing a strong inference of scienter, the court must draw all reasonable inferences from the allegations presented, including inferences unfavorable to plaintiffs. *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002). "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." ... [T]he inference of scienter must be more than merely "reasonable" or "permissible[,]" [however]—it must be cogent and compelling ... in light of other explanations.'" *Middlesex Retirement System,* 527 F.Supp.2d at 1179 (quoting *Tellabs,* 551 U.S. at 314, 127 S.Ct. 2499).

■ The first amended complaint relies, to some extent, on the statements of confidential witnesses. Before those witnesses' statements can support a strong inference of scienter, they must meet two requirements. First, "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners,* 552 F.3d at 995; see also *In re Siebel Systems, Inc. Sec. Litig.,* No. 04–0983, 2005 WL 3555718,*8–9 (N.D.Cal. Dec. 28, 2005) (allegations attributed to a confidential witness " 'must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge,'" quoting *In re Metawave Communications Corp.,* 298 F.Supp.2d 1056, 1068 (W.D.Wash.2003)).

Second, the information "reported by confidential witnesses with sufficient reliability and personal knowledge must [itself] be indicative of scienter." *Zucco Partners,* 552 F.3d at 995.

■ The Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *In re New Century,* 588 F.Supp.2d 1206, 1227 (C.D.Cal.2008) (citing *In re Read–Rite Corp.,* 335 F.3d 843, 846 (9th Cir.2003), abrogated by *Tellabs* on other grounds, as recognized in *South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776 (9th Cir. 2008), and *Ronconi v. Larkin,* 253 F.3d 423, 429 (9th Cir.2001)). The court therefore analyzes plaintiffs' falsity and scienter allegations in tandem below.

### E. Whether Plaintiffs Have Adequately Alleged that Ginsburg and Alston "Made" Misstatements

In their motions to dismiss, Ginsburg and Alston argue that plaintiffs fail adequately to plead that they "made" a material misstatement for which they can be held primarily liable under Rule 10b–5.[157] Specifically, they contend that plaintiffs engage in "group pleading," and that that is impermissible under the Supreme Court's recent decision in *Janus Capital Group, Inc. v. First Derivative Traders,* —— U.S. ——, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). *Janus Capital* examined whether a publicly traded company could be held liable for the actionable misrepresentations of a separate, but related, legal entity that served as its investment advisor. *Id.* at 2299. The Court addressed the proper construction of Rule 10b–5, which, as noted, makes it unlawful for "any per-

---

**157.** See BGM MTD at 4–5; Alston MTD at 4–5. The remaining individual defendants do not challenge the adequacy of allegations concerning their individual liability under Rule 10b–5.

son, directly or indirectly, ... [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. *Id.* at 2301. Specifically, it construed the operative verb "to make," and held that

"[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by— the party to whom it is attributed." *Id.* at 2302.

In reaching this conclusion, the Court declined to adopt a broader interpretation urged by the government. The government argued that "to make" should be construed as "to create." *Id.* at 2303. The Court noted that this construction would result in a grammatical anomaly, and "permit private plaintiffs to sue a person who provides ... false or misleading information that another person then puts into [a] statement." *Id.* at 2303 (quotation omitted). The individual providing information, the Court stated, merely engaged in "an undisclosed act preceding the decision of an independent entity to make a public statement," and should not be subject to liability under the securities laws. *Id.* at 2304.

The Ninth Circuit has not definitively addressed, and has left open, "whether, in some circumstances, it might be possible to plead scienter under a collective theory." See *Glazer Capital Management, LP v. Magistri,* 549 F.3d 736, 744–45 (9th Cir.2008). Numerous cases, however, have disapproved "group pleading," which "in its broadest form allows unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 363 (5th Cir.2004). Among these are three circuits that have concluded that group pleading is no longer viable following the enactment of the PSLRA. See *id.;* see also *Makor Issues & Rights v. Tellabs, Inc.,* 437 F.3d 588, 603 (7th Cir.2006), vacated on other grounds, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Winer Family Trust v. Queen,* 503 F.3d 319, 337 (3d Cir.2007). "Courts within the Ninth Circuit have also largely concluded that group pleading is not compatible with the PSLRA's requirements." *In re American Apparel, Inc. Shareholder Litigation,* No. CV 10–06352 MMM (JCGx), 2013 WL 174119, *25 (C.D.Cal. Jan. 16, 2013) (citing *In re New Century,* 588 F.Supp.2d at 1223–24 ("All of the Circuit courts that have expressly considered whether group pleading is compatible with PSLRA have concluded that it is not"); *In re Hansen Natural Corp.,* 527 F.Supp.2d 1142, 1153– 54 (C.D.Cal.2007) (holding that "the group pleading doctrine can no longer be used in pleading cases under the PSLRA," and noting that "[t]his view is shared by numerous district courts within this circuit"); *Petrie v. Electronic Game Card Inc.,* No. SACV 10–00252 DOC (RNBx), 2011 WL 165402, *3 (C.D.Cal. Jan. 12, 2011) ("Although the Ninth Circuit has yet to squarely address the issue, the majority of district courts within the Circuit to confront the group pleading doctrine post-*Tellabs* have decided that the doctrine did not survive. The Central District of California, in particular, appears to be unanimous in this conclusion"); *In re Tibco Software Securities Litigation,* No. C 05– 2146 SBA, 2006 WL 1469654, *27

(N.D.Cal. May 25, 2006) ("[C]ourts in this district are increasingly finding that the group pleading doctrine is contrary to the PSLRA"); and *In re Nextcard Securities Litigation*, No. C 01–21029 JF (RS), 2006 WL 708663,*3 (N.D.Cal. Mar. 20, 2006) ("This Court adopts the reasoning of the decisions concluding that the group published pleading doctrine no longer is viable after the PSLRA")).

Plaintiffs counter that they do not seek to hold Ginsburg and Alston liable simply by virtue of the fact that they are corporate officers. They contend that Alston signed Sarbanes–Oxley certifications for the quarters ended June 30, 2012 and September 30, 2012, as well as Forms 10–Q for those quarters, and that Ginsburg signed Forms 10–K for the years ended December 31, 2010 and 2011.[158] Since defendants do not attack the adequacy of plaintiffs' allegations that Ixia's quarterly and annual reports contained material misstatements during the class period, the court will assume, for purposes of this discussion, that each of these reports contained material misstatements or omissions, and address whether plaintiffs have adequately pled that Alston and Ginsburg "made" the statements.

■ As plaintiffs argue, courts that have disapproved the use of group pleading have observed that an individual defendant's signature on a document containing actionable misrepresentations is a sufficient basis upon which to hold that defendant liable. See *Southland Securities Corp.*, 365 F.3d at 365 ("[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue. Such specific facts

tying a corporate officer to a statement would include *a signature on the document* or particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement" (emphasis added)); *In re Hansen Natural Corp.*, 527 F.Supp.2d at 1153 (distinguishing among defendants that had "signed annual reports as well as a single Form S–8," and defendants that had not "played any role ... in the preparation or dissemination of any allegedly false statements"); *Petrie*, 2011 WL 165402 at *3 ("Plaintiffs have alleged no facts linking any of these alleged misrepresentations to Christiansen, Houssels or Farrell. For instance, Plaintiffs do not aver that any of these three Defendants signed any of the above-listed statements or authored the press releases. In fact, the Complaint specifically identifies other defendants as the signatories of the forms at issue"). Even in the absence of allegations regarding specific representations Alston and Ginsburg made concerning the company's financial reporting, therefore, their signatures on documents containing allegedly false representations could be sufficient to support a Rule 10b–5 claim.

■ The complaint, however, does not allege that Ginsburg is liable *because he signed* certain of Ixia's quarterly or annual reports. In fact, the complaint does not allege that Ginsburg signed any of the quarterly or annual reports that contained material misstatements. The only allegations plaintiffs make concerning Ginsburg's involvement in the preparation or dissemination of Ixia's financial reports are allegations common to all of the individual defendants. Plaintiffs assert that the individual defendants "possessed the authority to

158. Opposition at 10–11.

control to contents of [the reports]"; "received copies of [them]"; and "[b]ecause of their positions within [Ixia] ..." "knew that the adverse facts specified [in the complaint] had not been disclosed." Absent any allegations that Ginsburg signed quarterly or annual reports that contained purported misstatements, plaintiffs have not adequately alleged that he is individually liable under Rule 10b–5.[159] For that reason, plaintiffs' 10b–5 claim against Ginsburg must be dismissed.

■ The same is not true of Alston, however. The first amended complaint alleges that each Form 10–Q issued during the periods for which restated financial statements were prepared was signed and certified under Section 302 of Sarbanes–Oxley either by Bhatnagar or Alston as CEO and by Miller as CFO. Alston contends that plaintiffs fail to allege *which* documents he signed, and hence that the Rule 10b–5 claim against him must be dismissed. The court disagrees. The complaint alleges that each Form 10–Q was signed by Bhatnagar or Alston as CEO.[160] This gives rise to an inference that Alston signed the 10–Q's issued during his tenure as CEO. Alston does not dispute that he signed Forms 10–Q for the quarters ended June 30, 2012 and September 30, 2012. Nor could he, as defendants' request for judicial notice makes clear.[161] Accordingly, the court denies Alston's motion to dismiss plaintiffs' Rule 10b–5 claim against him on the ground that they have failed to allege that he "made" an actionable misstatement.

## F. Whether Plaintiffs Have Adequately Pled Scienter

### 1. Whether Plaintiffs Understatement Theory is Plausible

■ All defendants contend that plaintiffs fail to allege with the particularity required by PSLRA that they acted with scienter.[162] They assert that plaintiffs' overarching theory "defies logic" insofar as it is premised on a purported scheme to inflate Ixia's stock price by deliberately understating actual revenue and earnings and in turn overstating deferred revenue.[163] Defendants maintain that courts are skeptical of claims based on allegations that a company intentionally understated its revenue and income. The cases they

159. This is so notwithstanding the fact that judicially noticed documents demonstrate that Ginsburg did, in fact, sign certain of the documents. Plaintiffs dispute this, citing *In re American Apparel, Inc. Shareholder Litig.*, 2013 WL 174119 at *25. There, the shareholder-plaintiffs affirmatively alleged that two individual defendants were liable because they signed SEC filings containing material misstatements; the court, however, could not determine which of the documents each defendant had signed. See *id.* ("[T]he complaint alleges that both individuals signed a number of the SEC filings that contained allegedly false factual statements.... The complaint does not clearly allege, however, which documents Charney and Kowalewski authorized or signed, and the parties did not seek judicial notice of the documents in question"). Plaintiffs argue that, here, the court *has* judicially noticed the SEC filings, and hence can determine which of the forms Ginsburg signed. That the court has taken judicial notice of the SEC filings does not cure the fact that, unlike the *American Apparel* shareholders, plaintiffs have not alleged that Ginsburg is liable as a result of signing SEC filings. (See, e.g., FAC, ¶¶ 26, 156.) For that reason, *American Apparel* is inapposite, and plaintiffs' Rule 10b–5 claim against Ginsburg must be dismissed.

160. FAC, ¶ 156.

161. RJN, Exhs. 9, 10; Declaration of Eric Rieder in Support of Motion to Dismiss First Amended Complaint ("Rieder Decl."), Docket No. 83 (July 18, 2014), Exhs. 9, 10.

162. Combined MTD at 6.

163. *Id.*

cite are critical of misrepresentation allegations that assert a company has understated its revenue in order to inflate its share price; they do not, however, deal with the specific factual allegations pled in the first amended complaint. Three of defendants' cases concerned complaints that contained facially inconsistent allegations, or allegations that were inconsistent with the theory on which plaintiffs' fraud claim rested, and were dismissed for that reason. See *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, No. CIV 06–02674–PHX–RCB, 2011 WL 1253250, *21 (D.Ariz. Mar. 31, 2011) (" [T]he SAC also alleges that the Restatement 'admits' that Apollo's net income was *'understated* ... during FY04 due to Apollo's failure to properly account for in-the-money stock option grants.' This understatement allegation makes no sense if, as the SAC explicitly alleges, a critical aspect of the purported 'fraudulent scheme' was overstating earnings"); *McCasland v. FormFactor Inc.*, No. C07–5545 SI, 2009 WL 2086168, *8 (N.D.Cal. July 14, 2009) ("[P]laintiff's fraud theory depends on defendants' deliberate understatement of the costs of revenue and overstatement of gross margins. However, during two quarters during the class period (1Q07 and 2Q07) FormFactor overstated—not understated—the cost of revenues, thus understating—not overstating—its gross margins. These facts are inconsistent with plaintiffs' theory of fraud"); *Kelley v. Rambus, Inc.*, C 07–1238JFHRL, 2008 WL 5170598, *5 (N.D.Cal. Dec. 9, 2008) ("In addition, as Defendants point out, an overstatement of the value of 'in-the-money' options would mean that Rambus's compensation expenses for 2004 and 2005 would have been overstated. Logically, such overstatement would mean that the

price of Rambus stock purchased by Plaintiffs was deflated rather than inflated").

In *Davis v. SPSS, Inc.*, 385 F.Supp.2d 697 (N.D.Ill.2005), the court observed that some of plaintiffs' allegations appeared inconsistent, inasmuch as they pled that SPSS overstated licensing fees in 2002 and 2003, but understated them during the class period. *Id.* at 709. As respects understated licensing fees during the class period, the court found it "difficult to understand" how understating licensing fees supported plaintiff's contention that SPSS misstated its financials in order to inflate the price of its stock. It observed that it did not appear that understating revenue would "serve th[e] purpose" of inflating the stock price. Because the "understatement of revenue amount[ed] to less than 0.3% of SPSS' restated revenue for 2001," and because plaintiff "provided no facts concerning [the] misstatement to [permit it to] conclude otherwise," the court reasonably "infer[red] not that SPSS purposely manipulated its financials, but that reporting errors occurred." *Id.*

Defendants argue that plaintiffs similarly fail to allege facts from which one can reasonably infer that they manipulated Ixia's financials. They contend there are no allegations that would support an inference that analysts preferred higher deferred revenue "at the expense of lower actual revenues and earnings," nor any that would support an inference that defendants believed analysts or investors had such a preference. The complaint, however, is replete with references to the fact that analysts and investment firms looked to deferred revenue as an indicator of future growth.[164] The court must accept these allegations as true.

Moreover, in contrast to the fraud theories discussed in the cases cited by de-

---

**164.** See FAC, ¶¶ 3, 44–49.

fendants, plaintiffs contend that Ixia understated current revenue in order to overstate deferred revenue; stated differently, they assert that Ixia shifted revenue from the present to the future; all revenue was reported, but was attributed to an incorrect period.[165] This was done, plaintiffs allege, to create the false impression that Ixia had significant future growth potential as a result of its service and warranty subscriptions. As plaintiffs note, and defendants concede in their reply, the court found a theory similar to plaintiffs' plausible in *S.E.C. v. Stanard*, No. 06 CIV 7736(GEL), 2009 WL 196023, *19 (S.D.N.Y. Jan. 27, 2009). There, the CEO of RenaissanceRe Holdings, Ltd. ("RenRe"), James Stanard, was involved in a scheme to "smooth earnings" or defer income. The court acknowledged that "[l]ike any CEO, Stanard wanted RenRe's books to show smooth earnings growth over time. . . . Stanard was frustrated, however, by accounting rules that, to his mind, impeded RenRe from showing in its financial statements what he believed was 'a better reflection of the long-run economics of the business' than GAAP permit[ted]." *Id.* Defendants are correct that the scheme in *Stanard* involved a "sham transaction," not misapplication (in-

tentional or otherwise) of applicable accounting guidelines and rules. See *id.* at *7. *Stanard*, however, makes clear that plaintiffs' theory is a potentially plausible one, and the court thus finds defendants' arguments to the contrary unavailing.[166]

Defendants contend that plaintiffs' theory is refuted by their allegation that Ixia failed to meet its second quarter 2011 earnings forecast. They contend that if Ixia were manipulating its results to "bank" revenue in excess of guidance and analyst expectations, it surely would have drawn from that source to avoid missing expectations for the second quarter of 2011. They assert the fact that deferred revenue was treated consistently, even in the second quarter of 2011 when the company missed expectations, supports an inference that the class period treatment of deferred revenue was the result of consistent, albeit mistaken, accounting—not intentional manipulation of deferred revenue.[167] Plaintiffs counter that defendants' goal was to inflate Ixia's deferred service and warranty revenue so that it appeared it was a growth company with strong future prospects. sacrificing one quarter's earnings target to inflate deferred reve-

---

**165.** See FAC, ¶ 93 (quoting Ixia's April 8, 2013 press release concerning the first restatement: "The changes in the Company's revenue recognition practices will generally result in a shift of revenues between accounting periods in our previously issued financial statements, and *will not have any impact on the total revenues recognized over the life of a warranty and software maintenance contract or arrangement*, although the timing of the recognition of such revenues will generally commence earlier and end earlier than was reflected in our previously issued financial statement for the Restated Periods" (emphasis added)).

**166.** Plaintiffs cite a number of SEC litigation releases discussing enforcement proceedings involving overstatement of deferred revenue.

Only one of them involves a factual scenario like the one plaintiffs allege in their complaint, however. See SEC Files Settled Enforcement Action Against Veritas Software Corporation, 2007 WL 528458, *1 (Feb. 21, 2007) ("Veritas engaged in three improper accounting practices to manage its earnings and artificially smooth its financial results. Specifically, Veritas improperly (a) recorded and maintained excess accrued liabilities, employing 'accrual wish lists' and 'cushion schedules'; (b) stopped recognizing professional service revenue it had fully delivered and earned upon reaching internal targets; and (c) inflated its deferred revenue balance").

**167.** Combined MTD at 7–8.

nue, they contend, is consistent with the scheme.[168]

Defendants place the pleading bar too high. From a theoretical point of view, their position is arguably as compelling as plaintiffs', and may be insufficient for that reason to plead scienter. The court cannot simply dismiss plaintiffs' theory outright, however, without analyzing the adequacy of their allegations of scienter.

### 2. Whether the Complaint Alleges Facts That Give Rise to a Strong Inference of Scienter

#### a. Individual Allegations of Scienter

Defendants' arguments concerning the deficiencies in plaintiffs' pleading of scienter focus on their allegations concerning: (1) Ixia's violation of GAAP principles and inadequate internal controls; (2) stocks sales by certain individual defendants; and (3) Alston's resignation.[169]

#### i. Violation of GAAP and Inadequate Internal Controls

■■■ Defendants first contend that plaintiffs' allegations concerning purported violations of certain GAAP principles and Ixia's failure to ensure that it had adequate internal controls do not adequately plead scienter.[170] "In general, the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco Partners,* 552 F.3d at 1000. The same holds true for alleged violations of GAAP and inaccurate Sarbanes–Oxley certifications. See *DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385, 390 (9th Cir.2002) ("Thus, mere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of

scienter," citing *In re Software Toolworks, Inc.,* 50 F.3d 615, 628 (9th Cir.1994)); *Glazer Capital Management,* 549 F.3d at 747 ("Because Congress expressed no intent to alter the pleading requirements of the PSLRA, 'Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements,'" quoting *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1266 (11th Cir.2006)).

The Ninth Circuit, however, has recognized two narrow exceptions to this general rule. See *Zucco Partners,* 552 F.3d at 1000.

"First, a restatement due to accounting violations, without more, may be sufficient to establish a strong inference of scienter under those limited circumstances where the nature of the relevant [violation] is of such prominence or obviousness that it would be absurd to suggest that management was without knowledge of the violation. Second, an accounting violation may itself be indicative of scienter where it is combined with allegations regarding ... management's role in the company that are particular and suggest that the defendant must have known its accounting methodology was wrong." *In re Medicis Pharm. Corp. Securities Litigation* ("*Medicis I*"), 689 F.Supp.2d 1192, 1204 (D.Ariz.2009) (quoting *Zucco Partners,* 552 F.3d at 1000 and *South Ferry,* 542 F.3d at 785) (internal quotation marks omitted) (alteration original).

Defendants contend that the first amended complaint lacks any allegations

---

**168.** Opposition at 8.

**169.** Combined MTD at 9–23. They also attack the sufficiency of the CW allegations. These allegations concern purported violations of GAAP principles, and are addressed

in analyzing the sufficiency of that set of allegations.

**170.** *Id.* at 9.

concerning the individual defendants' roles that would indicate they had actual access to information indicating that Ixia was incorrectly accounting for revenue from warranty and software maintenance contracts.[171] Plaintiffs do not appear to dispute this, as they do not address the issue in their opposition.

Defendants contend the first amended complaint is likewise devoid of allegations showing that the individual defendants knew what the relevant accounting rules were and how they were being interpreted, much less facts showing that any allegedly incorrect interpretation was so unreasonable or obviously wrong that it would be "absurd" to suggest that they were not aware of the accounting mistakes that necessitated the restatements.[172] They contend, moreover, that plaintiffs do not identify any particularized GAAP rules that were purportedly violated, explain why their application was straightforward or state why it would have been obvious to the individual defendants—who are not alleged to be competent accounting professionals—that accounting rules were not being properly applied.

■■■ Plaintiffs counter that scienter can be inferred because deferred revenue was a "key metric" involving "core operations" that had been highlighted by analysts as indicative of Ixia's future prospects.[173] The Ninth Circuit has held that "in some unusual circumstances, the core operations inference, without more, may raise the strong inference required by the PSLRA." *South Ferry*, 542 F.3d at 785. The principal case that delineates the contours of these "unusual circumstances" is *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir.2008). There, the Ninth Circuit permitted a securities plaintiff to rely on the core operations inference without particularized allegations concerning defendants' access to relevant information. Defendants allegedly failed to disclose two stop-work orders from one of Applied Signal's largest customers despite the fact that those orders had "a devastating effect on the corporation's revenue." *Id.* at 987. The first stop-work order "halted between $10 and $15 million of work on the company's largest contract with one of its most important customers," while the second stopped $8 million worth of work. *Id.* at 988 n. 5. The court observed that "[t]he size of the contract and the prominence of the client raise[d] a strong inference that defendants would [have] be[en] aware of th[e stop-]order." *Id.* at 988 n. 5; see also *South Ferry*, 542 F.3d at 785 n. 3 (stating that the customers at issue in *Applied Signal* "made up 80% of the company's revenue, making the loss of even one contract disastrous for the entire company"). Defendants, moreover, admittedly knew about the stop-work orders only two weeks after the allegedly false statements were made because they disclosed them in an SEC filing. *Id.* As *South Ferry* court summarized, "[a]ll of these factors put *Applied Signal* into the exceedingly rare category of cases in which the core operations inference, without more, is sufficient under the PSLRA." *South Ferry*, 542 F.3d at 785 n. 3.

■■■ Here, in contrast to *Applied Signal*, plaintiffs do not allege facts from which the court can infer that deferred revenue was related to Ixia's "core operations." The first amended complaint, in fact, contains no allegations whatsoever from which one could infer that service and maintenance contracts on the compa-

---

**171.** Combined MTD at 10.

**172.** *Id.* at 10–11.

**173.** Opposition at 14.

ny's hardware products were "core operations." Moreover, the complaint contains references to "core" operations apart from the service and maintenance contracts.[174]

Furthermore, even were deferred revenue associated with a "core operation," this case is distinctly different than *Applied Signal*. The misrepresentation here involves allegedly intentional misapplication of accounting principles—not nondisclosure of allegedly disastrous information about which defendants *admitted* they knew within two weeks after the alleged misstatements were made. Compare *Applied Signal*, 527 F.3d at 987, 988 n. 5; see also *Zucco Partners*, 552 F.3d at 1001 (distinguishing *Applied Signal* because "the alleged misrepresentations [at issue in *Zucco Partners* did] not concern especially prominent facts," and "the falsity of the original representations would not be immediately obvious to corporate management" because "reporting false information will only be indicative of scienter where their falsity is patently obvious").

■ As *Zucco Partners* and *South Ferry* make clear, to rely on defendants' purported violation of GAAP principles to prove scienter, plaintiffs must plead facts demonstrating that defendants knew of the relevant principles and knew how the company was interpreting them. Additionally, they must plead facts explaining why employing an incorrect interpretation was so unreasonable or obviously wrong that it gives rise to a cogent inference of deliberate wrongdoing. See *In re Medicis Pharm. Corp. Sec. Litig.* ("*Medicis II* "), No. CV–08–1821–PHX–GMS, 2010 WL 3154863, *5 (D.Ariz. Aug. 9, 2010) ("A plaintiff, however, cannot merely point at a GAAP principle and contend that a correct interpretation was simple or obvious. At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that princip[le] was being interpreted. The plaintiff must then plead facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing").

Plaintiffs cite allegedly applicable GAAP principles, but do not plead facts demonstrating that defendants knew of the principles or knew they were being incorrectly interpreted and applied.[175] They make

---

174. The complaint appears to allege that Ixia's products, rather than the service and maintenance bundles packaged with them, are the company's "core" business. (See FAC, ¶ 39 ("These initial acquisitions piqued the interest of the investment community. For example, in its May 19, 2010 analyst report, [Wunderlich] reported that '[d]ata center and core routing product cycles ensure a growth cycle for' one of Ixia's newly acquired products.").) In judicially noticed SEC filings, moreover, Ixia noted that results were being driven by its *products*, not the services bundled with them. (See, e.g., RJN, Exhs. 15, 17; Rieder Decl., Exh. 15 at 741) (Ixia's Form 8–K dated 2/2/12) ("Accelerated demand for our 10G and high-speed Ethernet solutions drove growth in the quarter along with higher than expected sales of LTE and Wi–Fi testing solutions. We saw especially strong demand from equipment manufacturers and from customers in North America."); Exh. 17 at 767 (Ixia's Form 8–K dated 7/26/12) (" 'Our solid second quarter results were driven by healthy demand for our high-speed Ethernet, LTE and Wi–Fi products,' commented Vic Alston, Ixia's president and chief executive officer. 'We are very pleased with the momentum of our organic business—on a standalone basis we generated record revenue and non-GAAP operating profit in the quarter' ").

175. The first amended complaint references CW1's report that Will Liang was hired as an expert in recognizing software and maintenance contract revenue, and that "everyone above Will Liang" would "have been involved in any decision about how to recognize revenue relating to Ixia's software and mainte-

one conclusory reference in their opposition to the fact that Miller knew of the principles and "participated in the relevant accounting decisions," but they cite no allegation in the first amended complaint that substantiates this assertion. Even had such facts been pled, "general allegations about 'management's role in a corporate structure" do not give rise to a strong inference of scienter unless they are "buttressed with 'detailed and specific allegations about management's exposure to factual information within the company.'" *Zucco Partners,* 552 F.3d at 1000 (citation omitted); *In re Taleo Corp. Sec. Litig.,* No. C 09–00151 JSW, 2010 WL 597987, *8 (N.D.Cal. Feb. 17, 2010) (plaintiff "must allege facts to show that 'the defendants knew specific facts at the time that rendered their accounting determinations fraudulent'" (citation omitted)).

 Plaintiffs also contend they have shown that the GAAP violations defen-

dants committed were so basic that scienter can be inferred. It is true that specific allegations of significant GAAP violations will sometimes support an inference of scienter. See *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1273 (N.D.Cal.2000) ("When significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves"); see also *Batwin v. Occam Networks, Inc.,* CV 07–2750 CAS (SHX), 2008 WL 2676364 (C.D.Cal. July 1, 2008) (same). The GAAP violations plaintiffs plead were violations of general principles—not rules that require specific accounting treatment for deferred revenue. Each of the cases plaintiffs cite concerned the violation of a specific GAAP rule requiring that accounting be performed in a particular manner. None involved general principles that provide no particularized guidance.[176]

---

nance contracts." (FAC, ¶ 176.) Defendants argue that CW1's statement adds nothing to the first amended complaint, because plaintiffs' allegations concerning him are entirely conclusory. Plaintiffs do not cite CW1's statement in attempting to argue that defendants knew of the accounting violations and knew they made the reporting of deferred revenue unreasonable. They do contend, however, that defendants' attack on CW1 is "meritless." (Opposition at 18.) Plaintiffs' allegations concerning CW1's statement that everyone at Ixia above Liang would have participated in deciding how revenue would be recognized are not "accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *In re Siebel Systems, Inc.,* 2005 WL 3555718 at *8–9; *In re Metawave Communications Corp.,* 298 F.Supp.2d at 1068. Thus, it does not suffice to plead scienter. See *Zucco Partners,* 552 F.3d at 995 ("[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to estab-

lish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter").

**176.** See *Batwin,* 2008 WL 2676364 at *12 ("Plaintiff argues that by prematurely recognizing revenue in these ways, Occam violated Statement of Position ("SOP") 97–2, Software Revenue Recognition, issued by the Accounting Standards Executive Committee of the AICPA; SEC Staff Accounting Bulletin ("SAB") 104; and SAB 101, all of which essentially provide that revenue is recognizable only when four criteria are met: (i) there is persuasive evidence of an arrangement; (ii) delivery has occurred, (iii) the vendor's fee is fixed or determinable, and (iv) collectibility is probable"); *Medicis II,* 2010 WL 3154863 at *6 (concluding that plaintiffs had "adequately pled particular facts demonstrating that the executive [d]efendants were all well aware of SFAS 48, which governs revenue recognition where a right of return exists"); *Backe v. Novatel Wireless, Inc.,* 642 F.Supp.2d 1169, 1186 (S.D.Cal.2009) ("Given the complaint's allegations concerning early product ship-

Plaintiffs, moreover, cite no case law suggesting that the reporting of deferred revenue—and more particularly, deferred revenue in the software context—is so basic that a court can infer scienter from the mere fact it was reported improperly. To the contrary, they allege that Ixia needed to hire an expert, Will Liang, to handle this aspect of the company's accounting.[177] Furthermore, their allegation "that any competent accounting professional that has experience in the software industry would have known the correct rules to apply" is not probative of scienter, since none of the individual defendants is alleged to be an accounting professional.[178] In sum, far from supporting their position, plaintiffs' allegations suggest that reporting maintenance and service revenues is not "basic," "straightforward," or "patently obvious."[179] See *Perrin v. SouthWest Water Co.*, No. 2:08–CV–7844–JHN, 2011 WL 10756419, *10 (C.D.Cal. June 30, 2011) ("Plaintiffs argue that the GAAP violations were 'basic and longstanding GAAP rules pertaining to the timing of the depreciation expenses, the need to record revenue under the accrual basis rather than the cash basis, capitalization of assets, and accounting for intercompany transactions,' but the technical language employed to explain these rules in the Complaint, as well as the exhibits attached to the Opposition, fails to

illustrate the simplicity of the violated rules. Therefore, Plaintiffs fail to allege a strong inference of scienter based on the 'magnitude' of the Restatement or the simplicity of the GAAP rules that were violated").

As defendants argue, if plaintiffs' "boilerplate allegations were sufficient, an inference of scienter would follow virtually any time a company issued a restatement."[180] That, of course, is not the law. See *DSAM Global Value Fund*, 288 F.3d at 390 ("[S]cienter requires more than a misapplication of accounting principles"); see also *Zucco Partners*, 552 F.3d at 1000 ("In general, the mere publication of a restatement is not enough to create a strong inference of scienter").

Plaintiffs contend that the sheer magnitude of the violations provides additional evidence of scienter.[181] The authorities they cite, however, do not support this proposition. See *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir.2004) ("A complaint alleging accounting irregularities fails to raise a strong inference of scienter if it 'allege[s] no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did'" (citation omitted)); *Medicis II*, 2010 WL

---

ment, over saturated channels, a restatement of financial results based on GAAP violations, Defendant Leparulo's statement that the 'buck stops with him,' Defendant Weinert's SOX certifications that he attested to the accuracy of the Company's financial results and internal controls, and the simplicity of the accounting principles violated, Defendants' GAAP violations just as likely support an inference that Defendants Weinert and Leparulo acted with scienter as an inference of innocent and unknowing behavior").

177. FAC, ¶ 176.

178. *Id.*, ¶ 97.

179. The court does, however, agree with plaintiffs that they are not required to quantify the amount by which deferred revenues were inflated. See *In re Washington Mut., Inc. Securities, Derivative & ERISA Litigation*, 694 F.Supp.2d 1192, 1222 (W.D.Wash.2009) ("Plaintiffs are not required to quantify the amount by which the Allowance was understated"). This is especially true given allegations that the first restatement did not disclose the amount by which deferred revenue had been inflated.

180. Combined Reply at 5.

181. Opposition at 15.

3154863 at *5 ("The magnitude of the error, however, is not the only consideration. Courts must also weigh the complexity or simplicity of the relevant accounting standard," citing *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 792 (11th Cir.2010) (in analyzing the pleading of scienter, a district court may consider whether "the GAAP provision at issue [was or] was not a simple accounting policy")).

Additionally, plaintiffs' allegations belie any argument that the magnitude of the violations was such that scienter can be inferred. Plaintiffs concede that Ixia's GAAP violations merely shifted earnings from present to future periods; overall revenues were not impacted. They quote Ixia's April 8, 2013 press release, which stated that Ixia's changed revenue recognition practices was "generally [going to] result in a shift of revenues between accounting periods in [its] previously issued financial statements, *and [would] not have any impact on the total revenues recognized over the life of a warranty and software maintenance contract or arrangement,* although the timing of the recognition of such revenues [was] generally [going to] commence earlier and end earlier than was reflected in [its] previously issued financial statement[s]." [182] Plaintiffs do not plead that this statement was incorrect or misleading.

 For all of these reasons, the court concludes that plaintiffs' allegations concerning violation of GAAP principles does not adequately plead scienter. Plaintiffs' attempt to plead scienter through allegations concerning Ixia's lack of adequate internal controls is equally unavailing. As with the GAAP violations, they do not plead specific facts indicating that any of the individual defendants recklessly disregarded or intentionally exploited internal control deficiencies. Mere allegations that Ixia had deficient internal controls are insufficient to give rise to a strong inference of scienter. See *In re Maxwell Technologies, Inc. Securities Litigation,* 18 F.Supp.3d 1023, 1040–41, 2014 WL 1796694, *14 (S.D.Cal. May 5, 2014) ("Plaintiff appears to argue in the briefing that, given the nature of the violation, Defendants could not have missed the violations if they evaluated the internal controls as they claimed. Although the large amount at issue suggests Plaintiff's argument may be plausible, this Court does not have the information to evaluate this argument and conclude there is a strong inference of scienter. Plaintiff has not presented the necessary information about accounting principles and internal controls to allow this Court to evaluate whether the individual defendants should have been or must have been aware of the violations"); *In re ChinaCast Educ. Corp. Securities Litigation,* No. CV 12–4621–JFW (PLAx), 2012 WL 6136746, *7 (C.D.Cal. Dec. 7, 2012) ("Plaintiffs allege that ChinaCast's auditor, Deloitte, 'warned the Board that serious internal control weaknesses existed.' However, 'allegations that Defendants had deficient internal controls during the class period do[] not create a strong inference that Defendants knowingly [made] false or misleading statements,'" quoting *In re Loudeye Corp. Securities Litigation,* No. C06–1442MJP, 2007 WL 2404626, *7–8 (W.D.Wash. Aug. 17, 2007) (holding that allegations "[t]hat the controls were inadequate is perhaps an indication of incompetence, but incompetence, even gross incompetence, is no basis for a securities fraud claim")); *Karpov v. Insight Enterprises, Inc.,* No. CV09–856–PHX–SRB, 2010 WL 2105448, * 10 (D.Ariz. Apr. 30, 2010) ("Allegations

182. FAC, ¶ 93.

that Insight had material weaknesses in its internal controls do not, standing alone, give rise to a strong inference of scienter on the part of the company or its executives"); *In re Hypercom Corp. Sec. Litig.*, No. CV–05–0455–PHX–NVW, 2006. WL 1836181, *9 (D.Ariz. July 5, 2006) ("the fact that Hypercom issued a press release recognizing a lack of effective internal controls, is not overly probative as to whether Smolak intentionally misclassified the leases"); see also *In re Hansen Natural Corp.*, 527 F.Supp.2d at 1158 ("Presumably every company that issues a financial restatement because of GAAP errors will cite as a reason lack of effective controls").[183]

For these reasons, plaintiffs have not demonstrated that defendants' allegedly lax internal controls support a strong inference of scienter. See *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499 ("to qualify as 'strong' within the intendment of . . . the PSLRA . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent.*" (emphasis added)). Thus, neither their allegations of purported violations of GAAP principles nor their internal control allegations adequately plead scienter.

### ii. Stock Sales by Alston, Miller, and Ginsburg

" '[U]nusual' or 'suspicious' stock sales by corporate insiders [can] constitute circumstantial evidence of scienter[.]" *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 938 (9th Cir.2003) (citing *Silicon Graphics*, 183 F.3d at 986 (citation omitted)). Insider stock sales, however, are only suspicious if they are " 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Id.* (quoting *In re*

---

**183.** Defendants attempt to negate any inference of scienter because Ixia's class period financial statements were reviewed and audited annually by PwC, a well-respected independent accounting firm; that the auditors did not identify the accounting errors for an extended period of time, defendants contend, further refutes any inference that defendants made the errors knowingly. (Combined MTD at 11.) Plaintiffs counter that the fact PwC declined reappointment is a "red flag" that might actually indicate scienter, as opposed to negate it. The cases they cite, however, concerned allegations of more than merely the reaction of a company's auditors to its accounting errors. More fundamentally, they concern auditors' decision to *resign*, not situations in which auditors decline reappointment. See *McIntire v. China MediaExpress Holdings, Inc.*, 927 F.Supp.2d 105, 126–27 (S.D.N.Y.2013) ("Plaintiffs have pled a number of 'red flags' that contribute to support a reasonable finding of scienter. Plaintiffs have alleged that investigators visited CCME's facilities and found that no employees were actually working. They have also alleged that the CFO, two board members, and the independent auditor resigned"); *In re Spear & Jackson Securities Litigation*, 399 F.Supp.2d

1350, 1358 (S.D.Fla.2005) (listing "auditor resignations" as one of several indicia of scienter courts consider).

Plaintiffs also argue that, absent discovery, there is no way to know what communications transpired between PwC and Ixia, and accordingly that PwC's audit opinion cannot negate scienter for purposes of a motion to dismiss. The court agrees. See *In re Diamond Foods, Inc., Securities Litigation*, No. C 11–05386 WHA, 2012 WL 6000923, *8 (N.D.Cal. Nov. 30, 2012) ("Diamond further contends that the fact that its outside auditor, Deloitte, provided unqualified audit opinions undermines a finding of scienter. A clean audit opinion may possibly support the conclusion that defendants did not act with scienter, but it is not dispositive. In order to know how much reasonable reliance should be accorded the audit opinion, we will eventually have to evaluate what communications passed between the company and the auditor as well as what, if anything, was hidden from the auditor"). For that reason, PwC's audit opinion does not, standing alone, negate any otherwise compelling inference of scienter plaintiffs' pleading raises.

*Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citing *Silicon Graphics,* 183 F.3d at 986 in turn citing *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir.1996)). "[I]n determining whether the trading pattern is suspicious," courts can consider the insider's ability to trade. *Ronconi v. Larkin,* 253 F.3d 423, 436 (9th Cir.2001).

 Defendants do not dispute that evidence of insider trading can lead to an inference of scienter. They assert, however, that plaintiffs cite incorrect data in support of their allegations. Specifically, they contend that plaintiffs have inaccurately stated the number of shares the individual defendants held at the time of the sales referenced in the complaint, and that they also fail to take into account exercisable stock options.[184] Furthermore, defendants assert, the first amended complaint makes no attempt to allege the percentage by which any individual defendant's total holdings (i.e., shares plus exercisable options) decreased during the class period. As a result, they contend, plaintiffs' allegations regarding stock ownership and sales fail under Ninth Circuit precedent.[185] The court agrees. Because they do not take into account whether stock options held by individual defendants held could be exercised, plaintiffs' allegations fail to conform to the standard the Ninth Circuit has set for inferring intent from insider trading. See *Ronconi,* 253 F.3d at 435 n. 25 ("Stock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them"); *Silicon Graphics,* 183 F.3d at 986–87 (exercisable stock options should be considered in determining the percentage of shares sold). By omitting these details, plaintiffs fail to allege sufficient facts to support an inference of scienter from the allegedly suspicious trades.

Plaintiffs acknowledge that they failed to take exercisable options into account, and attempt to "accept as true" defendants' corrected values.[186] They assert that even defendants' corrected values have "been held to be indicative of scienter." See, e.g., *In re Omnivision Technologies, Inc.,* 2005 WL 1867717 at *14 (N.D.Cal.2005) (insider sales of 7% of shares sufficient to allege suspicious trading). Plaintiffs, however, cannot rely on defendants' corrected values effectively to amend their complaint.[187] See *Broam v. Bogan,* 320 F.3d 1023, 1026 n. 2 (9th Cir. 2003) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in

---

**184.** Combined MTD at 12.

**185.** *Id.*

**186.** Citing *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 140 (S.D.N.Y.1999), plaintiffs contend that stock options need not be taken into account at the motion to dismiss stage. Plaintiffs' reliance on *Oxford* is misplaced, however. First, it is an out-of-circuit decision and does not bind the court. Second, the *Oxford* court's decision not to consider vested options because they "are not shares" appears to contradict binding Ninth Circuit

precedent. More fundamentally, plaintiffs do not allege whether their figures do or do not include vested options.

**187.** Because plaintiffs allegations concerning stock sales by Ginsburg, Miller, and Alston fail to conform to Ninth Circuit law, the court declines to engage in an analysis of the hypothetical sales figures plaintiffs attempt to "accept as true" in their opposition. The correct figures should be set out in particularized allegations in an amended complaint.

opposition to a defendant's motion to dismiss," citing *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n. 1 (9th Cir. 1998) (emphasis original)); see also *Turbodyne Technologies*, 2000 WL 33961193 at *10 ("In deciding a motion to dismiss, courts may not 'take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).... The effect of plaintiffs' request that the court take judicial notice of Exhibit Q is the same, and the court declines to do so for that reason"). Accordingly, plaintiffs' allegations are deficient and do not plausibly support an inference of scienter.

Moreover, the complaint contains no allegations concerning the total number of shares held by Miller, Alston, or Ginsburg at the beginning or end of the pre-class period or the percentage of shares sold during the pre-class period. This is especially problematic, given that the court must compare pre-class period activity to activity during the class period in order to decide if, in fact, trading in the latter period is suspicious. Miller, Alston, and Ginsburg may well have acquired most of their shares during or immediately preceding the class period; if that is so, their class period trades may not be as suspicious. See *Silicon Graphics*, 183 F.3d at 986 ("When evaluating stock sales, we have held that the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious."). More fundamentally, absent allegations of pre-class period holdings, the court cannot determine whether plaintiffs have adequately alleged that class period sales were "dramatically out of line with prior trading practices." Compare *Zucco Partners*, 552 F.3d at 1005 (noting that a plaintiff must allege "a meaningful trading history" that can be compared with stock sales during the class period to determine suspiciousness). For this reason as well, plaintiffs' additional allegations of suspicious trading do not support a strong inference of scienter.

### iii. Alston's Resignation

■ Finally, defendants assail plaintiffs' contention that Ixia's explanation for Alston's resignation was a pretense designed to conceal his involvement in the fraudulent inflating of deferred revenue during the class period.[188] They contend that plaintiffs plead no facts casting doubt on the Audit Committee's statement that Alston resigned after it determined that he had lied about his academic credentials, his age, and his employment history.[189] They also assert that plaintiffs plead no facts that call into question the Audit Committee's finding that Alston did not engage in intentional misconduct respecting Ixia's financial results and financial statements.[190] The court agrees with defendants that plaintiffs plead no facts that call into question the reasonable assumption that Alston resigned (or was forced to resign) because he lied about his academic credentials, age, and employment history. Absent additional allegations that suggest the reasons given for Alston's resignation were suspicious, the court cannot conclude that plaintiffs have raised a strong inference of scienter based on Alston's resignation. See *Zucco Partners* 552 F.3d at 1002 ("Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the de-

188. Combined MTD at 23.

189. *Id.* (citing FAC, ¶ 101).

190. *Id.* (citing FAC, ¶¶ 10, 101).

fendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons"); *In re U.S. Aggregates, Inc. Securities Litigation*, 235 F.Supp.2d 1063, 1074 (N.D.Cal. 2002) ("Plaintiff can point to no particularized allegation refuting the reasonable assumption that [defendant's employee] was fired simply because the errors that [led] to the restatement occurred on his watch or because he failed adequately to supervise his department").

#### b. Holistic Review

■ As noted, even if individual allegations of scienter are not sufficient to give rise to a "strong inference" of knowledge or recklessness, the court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council*, 641 F.3d at 1095; *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir.2004) ("We find that the totality of the allegations does create a strong inference that Oracle acted with scienter, and we reverse the District Court"). Under this standard, "[v]ague or ambiguous allegations are ... considered as a part of [the] holistic review ... [because] the federal courts ... need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784. Even when a court is conducting a holistic review, however, "if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006. As the Supreme Court has instructed, the analysis is a comparative one. *Tellabs*, 551 U.S. at 310, 127 S.Ct. 2499 ("The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff").

■ Although in this case, the whole is indeed greater than the sum of its parts, the facts pled do not give rise to a "strong inference" of scienter that is as compelling as plausible innocent explanations.[191] Plaintiffs paint the picture of a company whose ability to portray itself as a growth company was heavily dependent on suggesting that it had a substantial amount of deferred revenue as a result of mainte-

**191.** While "[v]ague or ambiguous allegations are ... properly considered as part of a holistic review when considering whether the complaint raises a strong inference of scienter," *South Ferry*, 542 F.3d at 784, plaintiffs concede their allegations of suspicious stock trading are not adequately pled because they fail to take into account options that vested either before or during the class period. Plaintiffs also fail to allege the percentage by which defendants' shares (including vested options) increased or decreased during the class period. It is therefore entirely unclear that any of the alleged stock trades was actually suspicious. See *Silicon Graphics*, 183 F.3d at 986 ("When evaluating stock sales, we have held that the proportion of shares actually sold by an insider to the volume of shares he could have sold is probative of whether the sale was unusual or suspicious"); *Ronconi*, 253 F.3d at 435 n. 25 ("Stock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them"). For that reason, as currently pled, the suspicious stock trade allegations add nothing to the court's holistic review.

nance and service contracts. They assert the company was not growing as fast as the market wanted, and began artificially to deflate current quarterly revenue in order to book deferred revenue suggesting future growth. As for competing inferences, however, the words of the *Zucco Partners* court are instructive: "Although the allegations in this case are legion, even together they are not as cogent or compelling as a plausible alternative inference—namely, that although [Ixia] was experiencing problems controlling and updating its accounting and [service and maintenance revenue recognition] practices, there was no specific intent to fabricate the accounting misstatements at issue here." See 552 F.3d at 1007. Given the lack of particularized allegations that any defendant knew the relevant GAAP accounting rules, and knew that those rules were being violated, the facts alleged are equally, if not more, susceptible of the interpretation that Ixia, although dedicated to growth, simply misreported deferred revenue in the midst of a series of acquisitions and the integration of new businesses and revenue streams into its preexisting corporate structure. Even viewed holistically, plaintiffs' allegations do not strongly support an inference that Ixia intentionally understated its present revenue in order artificially to increase its deferred revenue. Indeed, the premise of plaintiffs' fraud theory—that investors preferred to have the company report more future than *present* revenue—is not compelling on the face of the pleading.

The fact that Ixia was required to issue the 2007 restatement—for fiscal years ended December 31, 2003, December 31, 2004, and December 31, 2005, and quarters ended March 31, 2006, June 30, 2006, and September 30, 2006—does not change this conclusion.[192] The 2007 restatement was necessitated by improper accounting for revenue related to Ixia's software and maintenance contracts. As defendants note, however, the 2007 restatement was required because Ixia had *overstated* current revenue derived from warranty and service contracts.[193] Viewed in combination with the first and second restatements, which involved the *understatement* of current revenue from the service and maintenance contracts, the 2007 restatement suggests that Ixia had ongoing difficulties properly accounting for its software service and maintenance contracts, or perhaps that it was grossly negligent in accounting for this revenue. What plaintiffs must allege, however, is "a degree of recklessness that strongly suggests actual intent." *Silicon Graphics,* 183 F.3d at 979.

Plaintiffs' allegations concerning the fact that Ixia hired Will Liang as a revenue recognition expert further support an inference that Ixia had ongoing problems properly accounting for its service and warranty contract revenue, to the point that it hired a specialist in that area. Based on the allegations in the complaint, it is at least as plausible that management was unable to control Ixia's accounting practices during the company's fast-paced integration of new acquisitions than that it was systematically manipulating the accounting to make it appear that the Ixia was making *less* money than was true in reality.

 In pleading scienter, "[t]he requisite recklessness must be an 'extreme departure from the standards of ordinary care, and ... present[] a danger of misleading buyers that is either known to the defendant or so obvious that the actor

---

192. FAC, ¶ 174.

193. Supp. Rieder Decl., Ex. 33 at 10 (listing total revenues as initially reported and total revenues as restated).

must have been aware of it.' " *Middlesex Retirement System,* 527 F.Supp.2d at 1179 (quoting *Silicon Graphics,* 183 F.3d at 984). Plaintiffs have failed to satisfy this stringent pleading standard, and therefore defendants' motion to dismiss must be granted.[194] Because it appears plaintiffs may be able to cure the pleading deficiencies, however, the court grants them leave to amend.

### G. Whether Plaintiffs Adequately Allege a Violation of Section 20(a) of the 1934 Act

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. It provides:

> "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts con-

stituting the violation or cause of action." 15 U.S.C. § 78t(a).

A *prima facie* case of control person liability requires allegations and evidence (1) that a primary violation of the securities laws has occurred and (2) that defendant directly or indirectly controlled the person or entity committing the primary violation. See, e.g., *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000); *Paracor Finance,* 96 F.3d at 1161. Plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing. *Id.* (quoting *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir.1993)). "Section 20(a) claims may be dismissed summarily ... [however,] if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco Partners,* 552 F.3d at 990. Because the court has dismissed plaintiffs' section 10(b) and Rule 10b–5 claims, there is no primary violation upon which to predicate section 20(a) liability. Consequently, it dismisses plaintiffs' § 20(a) claim.[195]

---

**194.** Because plaintiffs failed adequately to allege scienter as to any defendant, the court need not address Bhatnagar's argument that the complaint lacks sufficient allegations specifically to plead scienter on his part because he left Ixia early in the class period and also did not sell any stock during the period. (BMG MTD at 8–10.) The same is true of Alston's argument that plaintiffs have failed to plead scienter on his part because they do not allege that he was involved in any of the complex accounting decisions concerning revenue recognition. (Alston MTD at 7–8.) Plaintiffs should nonetheless take these defendants' arguments into account in drafting any future amended complaint to remedy any deficiencies in these aspects of their pleading.

**195.** Since plaintiffs have failed adequately to allege a primary violation, the court cannot conclusively address control person liability. The individual defendants' arguments concerning control person liability bear some mention, however. They first assert that

plaintiffs have failed to plead control person liability based on their relationship with Ixia. Specifically, they maintain that to allege the "control" element, plaintiffs "must plead ... that defendants exercised 'a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations.' " *In re McKesson HBOC,* 126 F.Supp.2d at 1277; see also *Lilley v. Charren,* 936 F.Supp. 708, 716 (N.D.Cal.1996) ("[P]laintiffs must allege facts showing that each defendant possessed the actual power to control the person primarily liable").

Control person liability is "an intensely factual question." *Howard,* 228 F.3d at 1065. Thus, all allegations in the complaint must be considered to determine if plaintiffs have adequately alleged that any individual defendant exercised a significant amount of control over the operations of the company. See *Batwin,* 2008 WL 2676364 at *25 (C.D.Cal. July 1, 2008) (" 'The traditional indicia of control are: having a prior lending relationship, own-

## III. CONCLUSION

For the reasons stated, the court grants defendants' motion to dismiss the first amended complaint in its entirety with leave to amend. Plaintiffs may file an amended complaint within thirty (30) days of the date of this order.

ing stock in the target company, or having a seat on the board,'" quoting *In re Surebeam Corp. Securities Litigation*, No. 03 CV 1721JM(POR), 2005 WL 5036360, *25 (S.D.Cal. Jan. 3, 2005), in turn citing *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1162 (9th Cir.1996)); *Kyung Cho v. UCBH Holdings, Inc.*, 890 F.Supp.2d 1190, 1208 (N.D.Cal.2012) ("Although not all courts agree, numerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status," citing *In re Charles Schwab Corp. Securities Litigation*, 257 F.R.D. 534, 550–51 (N.D.Cal.2009), and *In re Amgen Inc. Securities Litigation*, 544 F.Supp.2d 1009, 1037 (C.D.Cal.2008)). Given its dismissal of the primary violation claims, the court need

not assess the adequacy of plaintiffs' allegations against Alston, Ginsburg, Bhatnagar, and Miller in detail at this time.

One of Bhatnagar's individual arguments has particular merit, however. Since his alleged control of Ixia ended in May 2012—in the middle of the class period—he can be held liable only for misrepresentations and omissions made before that time. See *Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 690 F.Supp.2d 959, 979 (D.Ariz.2010) ("First, the court agrees with [defendant's] assertion that 'officers and directors' cannot be found 'liable as control persons under Section 20(a) for alleged violations that took place before they assumed their positions' "). The court directs plaintiffs to amend this aspect of their § 20(a) claim against Bhatnagar in any amended complaint.